**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **Manasay Hardy Ravelombonjy,**<br>Plaintiff, | Case No. 19 Civ. 7025 (ER) |
| v. | **AMENDED COMPLAINT<br>FOR DAMAGES** |
| **Jean Francis Zinsou & Colette Zinsou-Fatimabay,**<br>Defendants. | **Jury Trial Requested** |

Plaintiff Manasay Hardy Ravelombonjy ("Plaintiff" or "Mr. Ravelombonjy"), by and through his undersigned attorneys, with personal knowledge as to himself and his actions and otherwise on information and belief, hereby alleges as follows:

## INTRODUCTION

1.     Mr. Ravelombonjy was lured to the United States from his home in Madagascar with the promise of a stable job and the ability to support his family.  He hoped for a better life. At 30 years old, he left behind his pregnant wife and young son, coming to the United States for what he thought was a rare and promising opportunity to work for his aunt's husband—a prominent diplomat for the West African nation of Benin.  This purported "opportunity," however, was in fact a miserable charade, as a powerful couple exploited Mr. Ravelombonjy's labor and powerlessness.  Mr. Ravelombonjy was subjected to brutal working conditions and inhumane hours, as well as physical intimidation, emotional cruelty including public humiliation, and threats of deportation over the course of his work as a driver for Ambassador Jean Francis Zinsou ("Amb. Zinsou")   and   Colette   Zinsou-Fatimabay   ("Ms.   Zinsou-Fatimabay"   and,   collectively,

"Defendants"). Defendants wreaked havoc on Mr. Ravelombonjy by verbally abusing him and physically intimidating him, which ultimately resulted in Mr. Ravelombonjy's physical and mental health deteriorating significantly during his course of employment and having lasting effects. Mr. Ravelombonjy, who has been designated a victim of human trafficking by New York State, continues to suffer from effects of his mistreatment to this day.

2.      Defendants knowingly and willfully deceived Mr. Ravelombonjy by assuring him of a 40-hour per week job and reasonable wages, which was outlined in a formal contract ("Employment Contract") between Mr. Ravelombonjy and Amb. Zinsou. *See* Ex. A (Nov. 14, 2012 "Contract of Engagement" with English translation obtained by Plaintiff). Using these empty promises, Defendants recruited Mr. Ravelombonjy into the position, secured his presence in the United States, and then forced him to be at their beck and call on a nearly constant basis and to work excruciatingly long hours. Defendants did not pay Mr. Ravelombonjy for many of the hours worked, provided no overtime compensation, prevented him from seeking necessary medical treatment for the health problems he suffered as a result of their abuse, and subjected him to continuing emotional abuse through threats related to his job security and immigration status, lies about his work ethic and vacation time, and demeaning comments and actions.

3.      Defendants brought Mr. Ravelombonjy to the United States on pretext and, once they got him here, relegated him to a life of forced labor.

4.      Defendants demanded that Mr. Ravelombonjy be on call to work at all hours, often requiring him to be available and/or driving between 7:00 a.m. to 2:00 a.m., and sometimes later, with almost no time off. Mr. Ravelombonjy had fewer than ten days off over the course of his more than three years of employment by Defendants. Moreover, Mr. Ravelombonjy lived in fear of asking for any time off, even for illness, due to Defendants' ongoing threats of termination and

2

deportation. Defendants did not pay Mr. Ravelombonjy wages as required under state and federal labor laws requiring (1) the statutory minimum wage; (2) overtime pay, and (3) spread-of-hours pay.

5.      When Mr. Ravelombonjy's initial G-5 visa expired, Defendants orchestrated a plan for him to renew his visa under a different category, allowing his status to lapse and condemning him to undocumented status in the United States. Defendants' insistence that Mr. Ravelombonjy request a G-1—rather than a G-5—visa renewal resulted in his failure to secure a new visa in 2016. Then, having engineered Mr. Ravelombonjy's undocumented status, Defendants took advantage of his vulnerability and threatened him with deportation.

6.      Mr. Ravelombonjy prays relief for these violations of his legal rights. He brings this cause of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Fair Labor Standards Act ("FLSA") and New York labor laws, breach of contract, and common law to recover his rightful wages, punitive damages, and attorneys' fees and costs.

## JURISDICTION

7.      This Court's jurisdiction over the subject matter of this action is established under 28 U.S.C. §§ 1331, 1351, 29 U.S.C. § 201 *et seq.*, and under the civil remedy section of the TVPRA, 18 U.S.C. § 1595(a).

8.      This Court has supplemental jurisdiction over the state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367(a) because these claims are so closely related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction because the state law claims arise from the same common nucleus of operative facts from which the federal claims arise.

3

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiff

10.      Mr. Ravelombonjy is a resident of the State of New York and a citizen of Madagascar.

11.      At the outset of the events that give rise to this Complaint, Mr. Ravelombonjy was living in Madagascar.  Thereafter, he was admitted into the United States on or about April 30, 2013 pursuant to a G-5 Visa, which is available for attendants, servants, and personal employees of certain resident representatives of a foreign government that is a member of a specified international organization, as well as the immediate families of those attendants, servants, and personal employees. *See* 8 U.S.C. § 1101(a)(15)(G)(v).  Mr. Ravelombonjy was employed by Amb. Zinsou directly, as well as the Permanent Mission of the Republic of Benin to the United Nations ("Mission").

12.      Upon his arrival in the United States, Mr. Ravelombonjy lived in the basement of Defendants' residence at 4671 Fieldston Road, Bronx, New York 10471 continuously until approximately August 2016.  He has continued to reside in New York since escaping Defendants' residence in August 2016.

13.      From at least May 2013 through approximately July 2016, Mr. Ravelombonjy was a domestic worker for Amb. Zinsou as that term is defined by the Fair Labor Standards Act and New York Labor Law.  *See* 29 U.S.C. § 206(f); N.Y. Lab. L. § 2.

14.      Mr. Ravelombonjy's native language is Malagasy, and he is fluent in French.  His ability to speak and understand English was limited during the time he worked for Defendants.

4

**Defendants**

15.     Upon information and belief, Amb. Zinsou is a citizen of Benin.

16.     Upon information and belief, Ms. Zinsou-Fatimabay is a citizen of Madagascar.

17.     At all relevant times to this action, Defendant Jean Francis Zinsou ("Amb. Zinsou") served as the Permanent Representative of Benin to the United Nations, with the rank of Ambassador.

18.     At all relevant times to this action, Amb. Zinsou resided in Bronx, New York.

19.     Ms. Zinsou-Fatimabay is the wife of Amb. Zinsou, and at all relevant times to this action, she accompanied Amb. Zinsou during his posting in the United States, residing with him in Bronx, New York.

**STATEMENT OF FACTS**

**Defendants' Recruitment of Plaintiff and Trafficking to the United States**

20.     Plaintiff was born and raised in Antananarivo, Madagascar.  After attending university, he initially worked as a driver for the executive of a small digital marketing company, and later as a staff employee conducting search engine optimization.

21.     Ms. Zinsou-Fatimabay, who is Plaintiff's aunt, contacted Plaintiff's father in early 2012 about a job opportunity in the United States.  She expressed her husband's need for a driver because of his diplomatic assignment in New York as the Permanent Representative of Benin to the United Nations.  Upon information and belief, the Defendants interviewed four candidates, eventually choosing Mr. Ravelombonjy for the job.

22.     Defendants convinced Mr. Ravelombonjy that accepting the job as Amb. Zinsou's driver in the United States would benefit him and allow him to provide a better future for his family.

23.     Defendants told Mr. Ravelombonjy that Amb. Zinsou would employ two drivers, and that he and the other driver would alternate shifts so that he could have time off without limiting Defendants' access to a driver.

**The Employment Contract**

24.     In late 2012, Mr. Ravelombonjy's father provided him an Employment Contract, which was received, upon information and belief, from Defendants. *See* Ex. A.     Through correspondence with his father, Defendants convinced Mr. Ravelombonjy to sign the Employment Contract. Mr. Ravelombonjy signed the Employment Contract in approximately September 2012, procured a passport, issued on October 12, 2012, and applied for a tourist visa. Although he knew that coming to the United States would mean leaving his family for a long time, Mr. Ravelombonjy did so because he believed that his new job in the United States was a unique opportunity to make a better life for them. In late 2012, Mr. Ravelombonjy received the executed Employment Contract, signed by Amb. Zinsou and the Head of Chancery for the Mission and dated November 14, 2012. After providing documentation related to his employment with Defendants, Plaintiff was issued a G-5 visa on March 15, 2013.

25.     Article 3 of the Employment Contract specified that Mr. Ravelombonjy would work 40 hours per week, and be paid $1,900 per month plus a $160 subservice premium. Article 3 further provided that payment could be settled every two weeks. *See* Ex. A at 2.

26.     Article 3 also guaranteed Mr. Ravelombonjy health insurance, paid for by the Mission, and stated that Plaintiff would have up to one month of paid sick leave if he presented documentation from a physician. *See id.* at 3.

27.     Article 6 required Defendants "to guarantee a dignified human treatment" of Mr. Ravelombonjy, and provide him one day off per week. Article 6 also guaranteed that Defendants

6

would not keep Mr. Ravelombonjy's administrative and traveling documents, including his passport. *See id.* at 4.

28.     The Employment Contract also provided, at Article 8, for leave on Mission-recognized public holidays and, after one year of employment, for 30 calendar days of vacation leave. *See id.* at 3.  The Employment Contract also provided for a subservice premium and compensation for overtime worked. *Id.*

**Plaintiff's Arrival in the United States**

29.     Mr. Ravelombonjy packed his belongings and prepared for his job in United States. He said goodbye to his pregnant wife and young son with the hope that his job with Amb. Zinsou would enable him to build a better life for his family.  Mr. Ravelombonjy was also told at one point that his wife and son would eventually be able to come to the United States to join him.

30.     Plaintiff traveled to the United States by air on or about April 30, 2013, which, upon information and belief, was arranged by Ms. Zinsou-Fatimabay.  Prior to his arrival to the United States, Defendants did not indicate that Mr. Ravelombonjy would be required to pay for the cost of his flight.  Shortly after his arrival, however, in July 2013, Ms. Zinsou-Fatimabay forced Mr. Ravelombonjy to sign a document agreeing to repay the cost of the flight.  Ms. Zinsou-Fatimabay told him if he failed to pay for the flight, the money would be taken out of his paycheck.  Mr. Ravelombonjy paid Defendants for the full cost of his travel in installments over a five-month period.

31.     About three weeks after Mr. Ravelombonjy's arrival to the United States, Amb. Zinsou directed Mr. Ravelombonjy to give his passport to the Protocol Officer of the Mission, Marcelin Yevide.  At the same time, Amb. Zinsou also told Mr. Ravelombonjy to give the original

7

copy of his Employment Contract to the Protocol Officer, which was never returned. The Protocol Officer returned Mr. Ravelombonjy's passport after approximately three months.

32. After arriving, Mr. Ravelombonjy underwent two weeks of training, during which time he accompanied Amb. Zinsou's then-driver, Rene Dalum, to familiarize himself with New York, including the route from the Ambassador's house to the Mission and the United Nations. Amb. Zinsou signed Plaintiff's employment certification from the Mission on May 15, 2013, when Plaintiff's training ended. Plaintiff worked full-time beginning on or about May 16, 2013.

## Forced Labor, Exploitation, and Isolation in the United States

33. Upon his arrival and until his escape, Mr. Ravelombonjy lived in the basement near the garage of Defendants' residence at 4671 Fieldston Road, Bronx, NY 10471. While he was never told that he had to live at Defendants' residence, the hours that he was forced to work made living off the premises impossible. Defendants required the domestic workers to share a bathroom and refused Mr. Ravelombonjy's request to add a lock to his bedroom door, thereby denying him privacy. They also provided only limited access to a kitchen to prepare meals.

34. On his first night driving following training, Amb. Zinsou yelled at Mr. Ravelombonjy, calling him stupid for getting lost and missing the correct exit on the way back to Defendants' residence. Following that initial ride, Plaintiff's work hours were relatively normal for approximately four weeks because he shared his driving responsibilities with Mr. Dalum. After Mr. Dalum's departure, Defendants relied solely on Mr. Ravelombonjy to drive them any time they requested. Mr. Ravelombonjy's job consisted of taking Amb. Zinsou to the United Nations in the morning, and driving Defendants throughout the day. Though he was technically not employed contractually by Ms. Zinsou-Fatimabay, Defendants made their expectations clear that Mr. Ravelombonjy was required to drive both Amb. Zinsou and his wife wherever and whenever

8

needed, even for non-Mission related purposes. Eventually, Defendants also forced Mr. Ravelombonjy to drive their other family and friends, increasing Mr. Ravelombonjy's workload well beyond what was feasible or appropriate under the terms of his Employment Contract.

35. Amb. Zinsou's behavior during Mr. Ravelombonjy's shifts was often erratic and frightening. He was regularly aggressive while Mr. Ravelombonjy was driving. Amb. Zinsou would routinely demand that Mr. Ravelombonjy drive faster when he was running late to the UN. When Mr. Ravelombonjy refused to disobey the speed limits for fear of legal consequences, Amb. Zinsou often hit Mr. Ravelombonjy's seatback and headrest in anger, startling him and causing him to fear additional physical outbursts.

36. On or about May 2, 2013, Mr. Ravelombonjy met another Malagasy employee[1] at the Mission, who he subsequently saw regularly at the Mission over the next couple of months. In mid-June 2013, she invited him to a two-day prayer session on Saturday and Sunday with other Malagasy people in Albany, New York. Mr. Ravelombonjy asked Amb. Zinsou for permission to attend on the Friday before the prayer session, while driving him back to the residence. Mr. Ravelombonjy requested the weekend off because Amb. Zinsou was not working that weekend and did not require a driver. Amb. Zinsou granted the request, and Mr. Ravelombonjy went to Albany. On Sunday, while Mr. Ravelombonjy was already on the trip, Ms. Zinsou-Fatimabay called him. During this call, she explained that she disliked Malagasy people and threatened him with punishment for going to Albany. Upon his return from the trip on Sunday, Amb. Zinsou falsely denied granting Mr. Ravelombonjy leave to go to Albany. Defendants proceeded to scold

---

[1]     The term "Malagasy" refers to an individual from, as well as the language spoken in, Madagascar.

9

Mr. Ravelombonjy for going to the prayer session, and threatened to send him back to Madagascar if he continued to communicate with Malagasy people, whom they viewed as inferior.

37.     The Zinsous and the Mission also engaged in inappropriate and illegal employment practices with regard to Mr. Ravelombonjy, which were inconsistent with how they treated other employees, who were largely Beninese nationals.  Specifically, the Mission kept logs of other employees' work hours, but kept no such records for Mr. Ravelombonjy.     When Mr. Ravelombonjy questioned why this was the case, Amb. Zinsou told Plaintiff that the work records were in his head, and he did not need any written work records.  Plaintiff therefore kept his own work log to help keep track of his hours.

38.     In or about mid-July 2013, Defendants began requiring Mr. Ravelombonjy to work late into the night and demanded that he work seven days a week, contrary to the terms of his Employment Contract.  Despite the long hours, neither the Mission nor Defendants provided Mr. Ravelombonjy with overtime wages.  His payment remained the same every month he was employed by Amb. Zinsou.  Because he was either on call or driving Defendants from the early morning until the middle of the night, he had essentially no time to sleep, seek medical care when he fell ill, prepare meals, or perform other basic tasks necessary to maintain even a mediocre standard of living.  At times, both Amb. Zinsou and Ms. Zinsou-Fatimabay requested rides to different places at the same time.  When Mr. Ravelombonjy appropriately prioritized driving Amb. Zinsou during these times, Ms. Zinsou-Fatimabay demanded that Mr. Ravelombonjy pay for the taxi rides she took when he was unavailable to drive her.  Scared that he had no choice but to pay her, Mr. Ravelombonjy reimbursed Ms. Zinsou-Fatimabay for her taxi rides.

39.     When Mr. Ravelombonjy requested one day off after working a seven-day week in or about July 2016, Amb. Zinsou yelled at him, warning him to stop asking questions like that.

10

Amb. Zinsou threatened to terminate Mr. Ravelombonjy for asking for time off and indicated that Defendants alone decided when he would have a day off. At times when Mr. Ravelombonjy was sick or exhausted from his strenuous work schedule, he was too scared to ask for time off, because Defendants told him that they do not need sick people. Defendants further told Mr. Ravelombonjy that if he did not work, he would be fired and have to find another job (and sponsor) or go back to Madagascar. In addition, throughout Mr. Ravelombonjy's employment, Defendants called his family in Madagascar to tell them that he may be terminated and sent back—claiming that Mr. Ravelombonjy was doing a poor job. Defendants' actions caused Mr. Ravelombonjy embarrassment and prevented him from being able to confide in his family about what was happening. Because of Defendants' threats in the face of his infrequent requests for rest, Mr. Ravelombonjy began to blame himself for his mistreatment, believing that seeking even one day off was inappropriate and impermissible.

40.    When Mr. Ravelombonjy first arrived in the United States, Defendants gave him a cell phone so he would always be available for their ride requests. However, in or about September 2013, Defendants confiscated the cell phone they originally provided to Mr. Ravelombonjy thereby forcing him to purchase a new phone with his own money to be at their beck and call twenty-four hours a day. Because a cell phone plan was expensive, Mr. Ravelombonjy was forced to save his money so that he could buy minutes to call his wife and family back home in Madagascar. Because of the long hours of his forced labor and inadequate wages, Mr. Ravelombonjy was only able to call or message his wife about once a week, but never spoke to his family in front of the Defendants.

41.    In or about May 2014, Defendants further limited Mr. Ravelombonjy's access to the kitchen in the residence, with Ms. Zinsou-Fatimabay charging him a fee for access to and use

11

of the refrigerator.  After paying the fee for approximately one month, Mr. Ravelombonjy found a miniature refrigerator discarded on the side of the road and placed that in his room for his personal use.  Mr. Ravelombonjy was sometimes able to prepare meals for the next day when he finished work for the night.  However, Defendants required him to work such long hours on call as Amb. Zinsou's driver in Manhattan, where Mr. Ravelombonjy could not afford prepared meals. Consequently, Mr. Ravelombonjy was often forced to procure meals from a nearby restaurant at his own expense or go hungry.  Poor nutrition resulted in additional harm to his physical health.

**Plaintiff Was Abused During His Employment with Defendants**

42.   As Defendants continued to require Mr. Ravelombonjy to work inhumane hours, his physical and emotional health deteriorated.  His anxiety increased because of the workload and the demands Defendants placed on him, often leaving him unable to eat or sleep.  In 2015, Mr. Ravelombonjy began experiencing blurry vision from exhaustion.  As his eating habits, activity level, and sleep schedule worsened, he developed pre-diabetes.  On one occasion, Mr. Ravelombonjy fainted from exhaustion associated with his deteriorating health.  He also experienced shaking and feeling very hungry because he had no time to get or prepare food due to the strenuous and exhausting schedule imposed on him by Defendants.  In one instance, Mr. Ravelombonjy experienced such acute anxiety while driving Ms. Zinsou-Fatimabay that his chest pains forced him to be taken by ambulance to the hospital.  Because he could not complete the ride, Ms. Zinsou-Fatimabay demanded another employee drive her, whom she paid.  She then demanded that Mr. Ravelombonjy reimburse her for that payment.  Following his one-day stay in the hospital, Mr. Ravelombonjy was unable to work for three days, but then resumed his normal driving schedule.  During the three days that he did not work, Mr. Ravelombonjy stayed at a

12

friend's house because he feared that Defendants would force him to work if he remained at the residence.

43.     One night in or about February 2014, Amb. Zinsou was working late at the Mission during a massive snowstorm. Mr. Ravelombonjy approached the Ambassador at the Mission in the evening to warn him about the storm and advise him that they should head home to the Bronx before the worst of the blizzard began. Amb. Zinsou refused, admonishing Mr. Ravelombonjy for suggesting that the Ambassador may not be aware of the risks of the storm. Eventually they headed home amid treacherous driving conditions. When they arrived back at the Zinsou's residence, the garage and much of the rest of the area around the house was snowed in. Amb. Zinsou forced Mr. Ravelombonjy to shovel the snow, even as it continued to fall. Mr. Ravelombonjy did not have the proper clothing and footwear to withstand the storm, but worked late into the night to clear the snow, as Amb. Zinsou shouted out the window for him to work faster. After approximately two hours of shoveling, Mr. Ravelombonjy was able to get the car into the garage at approximately 2:30 a.m. As Mr. Ravelombonjy walked back into the house shivering and crying, Amb. Zinsou laughed at Mr. Ravelombonjy's haggard appearance and took photographs of him, who was soaked. Amb. Zinsou warned Mr. Ravelombonjy not to claim he was sick the next day, and insisted that he would have to work.

44.     In another instance in 2015, after long work hours, Mr. Ravelombonjy collapsed on his bed after exercising for a short period, as required by his doctor following his pre-diabetes diagnosis. Amb. Zinsou kicked in Mr. Ravelombonjy's door, and Defendants barged into his room. They told Mr. Ravelombonjy that they were not paying him to sleep and demanded that he work. Mr. Ravelombonjy, physically unable to move or drive, remained in bed. Fearing that Amb.

13

Zinsou would fire him if he took any more time to rest, Mr. Ravelombonjy returned to work the next day.

45.     As a result of the stressful and inhumane working conditions that he was subject to, Mr. Ravelombonjy developed diabetes and other medical issues during his time of employment. He developed a painful abscess on his right arm, but because of his long hours was unable to seek medical attention to obtain treatment.  The pain became so severe that Mr. Ravelombonjy began to favor his other arm and effectively drove with one hand.  Amb. Zinsou ignored Mr. Ravelombonjy's request for time off to see a doctor.  However, when a guest of Amb. Zinsou noticed Mr. Ravelombonjy driving with one hand, the guest suggested Mr. Ravelombonjy seek medical attention.  Amb. Zinsou relented, allowing Plaintiff to receive medical attention and have the abscess removed.  After the procedure, Mr. Ravelombonjy stayed in the hospital overnight and returned to the residence the next day.  Then, only two days after the invasive surgical procedure, Mr. Ravelombonjy returned to work.

46.     In another instance, after Mr. Ravelombonjy drove Amb. Zinsou back to the residence and arriving there at approximately 2:00 a.m., Amb. Zinsou told him they would need to leave at 7:00 a.m. that morning.  When Mr. Ravelombonjy told Amb. Zinsou that these hours were impossible to sustain, Amb. Zinsou became enraged.  Amb. Zinsou told Mr. Ravelombonjy that he had no rights, and that he was not really in the United States, but was in Benin because he worked for the Ambassador.  Amb. Zinsou yelled that people in Benin have to work harder and that Mr. Ravelombonjy must work whenever he is told to do so.  During this exchange, Amb. Zinsou made a fist and appeared ready to punch Mr. Ravelombonjy.  After this incident, Mr. Ravelombonjy's fear of Defendants led him to remain silent, even when the working conditions he faced became increasingly unbearable.

14

47. Numerous times during his employment, Mr. Ravelombonjy noticed that Defendants searched his room and opened his mail without his permission. On more than one occasion, Mr. Ravelombonjy returned to his room and found that items had been moved. At least three times, Ms. Zinsou-Fatimabay also handed Mr. Ravelombonjy opened mail that had been addressed to him as much as three months earlier, claiming that she did not realize it was his mail.

48. Defendants frequently told Mr. Ravelombonjy one thing and then denied it later (*i.e.* gaslighted), only to become angry when he complied with their earlier instructions. Because of his stress, exhaustion, and fear of displeasing Defendants, in February 2016, Mr. Ravelombonjy began recording conversations that he had with Defendants on his cell phone—so he could confirm the instructions he was being given. In April 2016, during a disagreement with Ms. Zinsou-Fatimabay, Mr. Ravelombonjy told her that he was recording their conversations. He explained to Ms. Zinsou-Fatimabay that he was making the recordings because the Defendants would tell him to do one thing and would then change what they said. About a week after Mr. Ravelombonjy told Ms. Zinsou-Fatimabay about the recordings, in May 2016, Amb. Zinsou met with Mr. Ravelombonjy at the Mission, trying to get information about his visa status. While in his office at the Mission, Amb. Zinsou demanded Mr. Ravelombonjy produce his cell phone. Afraid for his safety and his immigration status, Mr. Ravelombonjy complied. When Mr. Ravelombonjy handed the phone over, Amb. Zinsou looked through the phone and saw several recordings on it. Mr. Ravelombonjy asked for the cell phone back and Amb. Zinsou became enraged. He accused Mr. Ravelombonjy of making the recordings to form a case against Defendants. Amb. Zinsou demanded that Mr. Ravelombonjy transfer these recordings from his personal cellphone to the computer at the Mission and ensure there were no other copies. Amb. Zinsou threatened to withhold support for renewing Mr. Ravelombonjy's expiring visa and threatened to involve U.S

15

authorities and Beninese military leadership.  Amb. Zinsou called Awali Imorou, the Mission Protocol Officer at the time, to act as a witness and proceeded to give him Mr. Ravelombonjy's cell phone.  Amb. Zinsou then instructed the Protocol Officer to check all of Mr. Ravelombonjy's electronics and to transfer the recordings to a computer, which he did.  The Protocol Officer told Mr. Ravelombonjy that they should be deleted because Amb. Zinsou was angry and that doing so would avoid more problems for Mr. Ravelombonjy.  Amb. Zinsou also told the Protocol Officer to delete the recordings from the cell phone once they were transferred to the Mission computer and to make sure there were no other copies.  Mr. Ravelombonjy does not know what happened to the recordings that were transferred to the Mission computer.

**Defendants' Attempt to Change Plaintiff's Immigration Status and Termination**

49.    Mr. Ravelombonjy's G-5 visa expired on April 28, 2016.  Approximately three months prior to his visa's expiration, Mr. Ravelombonjy asked the Head of Chancery at the Mission and Amb. Zinsou about ensuring his immigration status was up to date, each of whom insisted that visa renewal was the other's responsibility.  After at least three requests for a visa status, Amb. Zinsou informed Mr. Ravelombonjy that some unnamed people at the Mission did not like him because he was Malagasy.  Amb. Zinsou told Mr. Ravelombonjy that his G-5 visa would not be renewed.  Instead, the Protocol Officer informed Mr. Ravelombonjy that the Mission would attempt to change his immigration status from G-5 to G-1, so that he would be employed by the Mission directly, rather than by Amb. Zinsou.  Upon information and belief, Defendants sought to make this change to ensure that Mr. Ravelombonjy was no longer a direct employee of Amb. Zinsou, which was how he was described under his then-existing visa and under the Employment Contract.

16

50. Mr. Ravelombonjy repeatedly asked for information about his visa status, and alerted Defendants that his visa was set to expire at the end of April 2016. Upon information and belief, the Mission and Defendants submitted an application to the United States Citizenship and Immigration Services to change Mr. Ravelombonjy's immigration status to a G-1 visa holder on or about May 23, 2016, after his visa expired. *See* Ex. B. Upon information and belief, Amb. Zinsou communicated with United States and United Nations authorities to change Mr. Ravelombonjy's visa type. Around the same time, Amb. Zinsou also insisted that Mr. Ravelombonjy sign a new employment agreement but did not explain why it was necessary. The new alleged agreement listed the Mission as Mr. Ravelombonjy's sole employer, excluding Defendants from the document. The new alleged agreement further provided that Mr. Ravelombonjy would be a driver for members of the Mission and other officials. *See* Ex. C (alleged "Employment Contract" with English translation obtained by Plaintiff's counsel).

51. On or about June 7, 2016, James B. Donovan, Minister Counselor of Host Country Affairs at the United States Mission to the United Nations, denied the visa request, saying that if Mr. Ravelombonjy needed a new type of visa because his duties at the Mission changed, he would have to return to Madagascar and apply for a new visa. *See* Ex. B. Amb. Zinsou insisted that Mr. Ravelombonjy seek a G-1 visa as an employee of the Mission, rather than a renewal of his G-5 visa as the Ambassador's personal employee, to avoid responsibility for his abusive treatment of Mr. Ravelombonjy. This delay and attempt to change the visa type directly resulted in Mr. Ravelombonjy's failure to secure a new visa. Upon information and belief, Defendants have sought to have themselves removed from Mr. Ravelombonjy's Complaint before the Department of Labor, claiming that the Mission, not they, employed Mr. Ravelombonjy.

52.     On or about July 26, 2016, Mr. Ravelombonjy filed a Minimum Wage/Overtime Complaint as a Domestic Worker with the New York State Department of Labor.  *See* Ex. D.  On or about July 27, 2016, Amb. Zinsou responded with a letter to Mr. Ravelombonjy notifying him that he would be terminated on August 31, 2016.  *See* Ex. E (July 27, 2016 Letter from Amb. Zinsou to Plaintiff regarding termination of employment with English translation obtained by Plaintiff's counsel).  Upon information and belief, the New York State Department of Labor sent Amb. Zinsou a letter on or about April 10, 2017 notifying him that he owed Mr. Ravelombonjy $69,090.88 in unpaid overtime wages.  *See* Ex. F.

**Plaintiff Flees Defendants' Control**

53.     On August 10, 2016, Mr. Ravelombonjy called Rebecca de Simone, Director of the Human Trafficking Program at My Sisters' Place, a non-profit organization that assists victims of human trafficking, seeking help.  After a phone assessment, Ms. de Simone concluded that Mr. Ravelombonjy's circumstances met several criteria for human trafficking.  My Sisters' Place helped Mr. Ravelombonjy move into a shelter, where he received medical, dental, and mental health referrals, individual counseling, and emergency financial assistance.  Mr. Ravelombonjy lost possession of his laptop computer, which he last saw in Defendants' residence.

54.     My Sisters' Place referred Mr. Ravelombonjy's case to the New York State Division of Criminal Justice Services and Office of Temporary and Disability Assistance.  On or about July 21, 2017, the State of New York confirmed Mr. Ravelombonjy's status as a victim of human trafficking.  *See* Ex. G.

55.     Mr. Ravelombonjy is in the process of applying for immigration benefits as a victim of human trafficking, and has been in contact with law enforcement, including the Diplomatic Security Service within the United States Department of State, regarding Defendants' conduct.

Mr. Ravelombonjy has not seen his wife or son in over five years and the way in which Defendants used his immigration status and visa renewal application has caused him great difficulty as he attempts to reunite with his family.

**Violations of the Employment Laws and Breach of Contract**

56.     At all relevant times to this action, Defendants had the power to hire and fire Plaintiff.  Defendants also had the power to terminate Plaintiff's employment.

57.     At all relevant times to this action, Defendants had the power to set Plaintiff's schedule.

58.     At all relevant times to this action, Defendants jointly supervised Plaintiff.

59.     At all relevant times to this action, Defendants jointly controlled Plaintiff's work conditions.

60.     At all relevant times to this action, Defendants were employers of Plaintiff as defined under applicable employment laws.  29 U.S.C. § 203(g); N.Y. Lab. L. § 190.

61.     Plaintiff was paid a total of $1,900 in salary and $160 as a subservice premium each month from approximately June 2013 to August 2016.  The Mission issued and Amb. Zinsou signed the checks, noting that payments were for Plaintiff's "salary."   Because Plaintiff was driving or on call to drive at all times, with less than 10 days off throughout his employment, he is owed payment for all hours (less 10 days off and the 40 hours per week for which he was paid) between approximately May 1, 2013 and July 27, 2016.

62.     Defendants did not pay the statutory federal or state minimum wage rate, which ranged between $7.25 and $9.00 during Plaintiff's period of employment.

63.     Defendants did not pay Plaintiff the required overtime pay over forty-four hours of work per week as required by New York State law and pursuant to the terms of the Employment

Contract. Defendants' failure to pay Plaintiff overtime pay also violated the Employment Contract between the parties.

64.     Defendants did not regularly inform Plaintiff about the minimum wage or overtime pay requirements or obtain his acknowledgment of the provision of such notice.

65.     Defendants did not pay Plaintiff for the spread of hours pay as required under New York State law: an additional hour of pay for those days in which the interval between the time Plaintiff started and ended was more than ten hours.

66.     Upon information and belief, Defendants did not maintain proper records for Plaintiff's work schedules and pay. Defendants did not provide him with wage statements that included his hourly wage, as required by law.

67.     Upon information and belief, at all times relevant to this action, Defendants did not post any information indicating the laws regarding the minimum wage and overtime pay, or otherwise provide Plaintiff information about his rights under federal or state employment laws.

68.     Defendants' failure to inform Plaintiff of his rights was willful and/or intentional, as it was designed to keep Mr. Ravelombonjy in a continued state of ignorance and forced labor.

69.     In 2008, Congress amended the Trafficking Victims Protection Reauthorization Act to prevent trafficking of domestic workers with G-5 visas. 8 U.S.C. § 1375c; Pub. L. No. 110-457, Title II, § 203, 122 Stat. 5057 (2008).

70.     The United States State Department issued a provision in the Foreign Affairs Manual ("FAM"). Under 9 FAM § 402.3-9(B)(3)(U), an employee of an international organization or mission seeking to obtain a G-5 visa for their personal attendant must present an employment contract to the United States government "in both English and (if the applicant does not understand English) a language understood by the applicant, that has been signed by both the

20

applicant and the employer to demonstrate that the employee will receive a fair wage, and that the employee understands his or her duties and rights regarding salary and working conditions." In addition, the contract must, among other things: (i) describe the work to be performed; (ii) specify the normal working hours and number of hours of work to be completed per week; (iii) indicate the amount of time the employee will have off, including a minimum of one full day per week, the number of paid holidays, sick days and vacation days; (iv) state the hourly wage to be paid to the domestic employee which must be the greater of the minimum wage under U.S. Federal, state, or local law; (v) state when the wages will be paid, either weekly or biweekly; (vi) provide the terms of payment for overtime work; (vii) state the manner in which employees will be paid – either by check or electronic transfer; (viii) state that the employer agrees to abide by all Federal, state and local laws of the United States; and (ix) provide that the employee will maintain access to their passport and visa.  9 FAM § 402.3-9(B)(4)(U).

71.     On information and belief and as described more fully above, the actual conditions of Plaintiff's employment did not satisfy the requirements of 9 FAM § 402.3-9(B)(4)(U).

## FIRST CLAIM FOR RELIEF

### Trafficking Victims Protection Reauthorization Act ("TVPRA")
### Forced Labor: 18 U.S.C. §§ 1589, 1595

72.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

73.     As set forth in 18 U.S.C. § 1595, Plaintiff may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of these provisions.

21

74.     The forced labor provision of the TVPRA, 18 U.S.C. § 1589, establishes: "(a) [w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)."

75.     Defendants were perpetrators of the violations of 18 U.S.C. § 1589.

76.     As set forth herein, Defendants knowingly obtained Plaintiff's labor and services through physical threats, coercion, isolation, intimidation, and by maintaining control over Plaintiff's passport and visa for approximately three months after his arrival to the United States.

77.     As set forth herein, Defendants developed and participated in a scheme that included, but was not limited to, confiscating Plaintiff's passport and visa, intending to cause Plaintiff to believe that if he did not perform the inhumane labor or services Defendants required, he would be deported or suffer serious harm, and depriving him of sleep and forcing him to work past the point of exhaustion and illness.

78.     As set forth herein, Defendants emotionally and physically abused Plaintiff, forcing him to work extremely long hours in often brutal conditions.  Through the pattern of abuse, overwork and mistreatment, Defendants intimidated Plaintiff into believing that it was his duty to cater to their unlawful and unreasonable demands.  Defendants used Plaintiff's national origin,

22

immigration status and other information to deceive him into believing that he had no option but to serve the Defendants and cater to their every demand.

79.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**
**Trafficking With Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor:**
**18 U.S.C. §§ 1590, 1595**

80.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

81.    As set forth in 18 U.S.C. § 1595, Plaintiff may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of these provisions.

82.    The trafficking into peonage, slavery, involuntary servitude, or forced labor provision of the TVPRA, 18 U.S.C. § 1590, provides:  "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both."

83.    Defendants were perpetrators of the violations of 18 U.S.C. § 1590.

84.    As set forth herein, Defendants knowingly recruited, harbored, transported, provided, and obtained Plaintiff to provide forced labor and services to Defendants in violation of laws prohibiting forced labor.

85.    As set forth herein, Defendants knowingly induced a system of servitude by means of coercion, isolation, intimidation, and by maintaining control over Plaintiff's passport and visa.

23

This pattern of behavior included threats to Plaintiff's immigration status, his well-being, and his reputation both in the United States and in Madagascar.

86.     As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### Fair Labor Standards Act (FLSA) Minimum Wage
### 29 U.S.C § 201 *et seq.*

87.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

88.     Because Plaintiff was employed as a domestic worker in a household at times relevant to this action, Plaintiff was engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 202(a).

89.     Because Amb. Zinsou was an employer under the Employment Contract, and because Ms. Zinsou-Fatimabay acted in the interest of Amb. Zinsou, both Defendants are employers under 29 U.S.C. § 203(d).

90.     Section 6(a) of the FLSA, 29 U.S.C. § 206(a), provides that any employee engaged in commerce shall be paid wages at a specific rate during the period of Plaintiff's employment.

91.     In almost all periods of Plaintiff's employment, Defendants knowingly and willfully failed to pay Plaintiff an hourly rate of at least the federal minimum wage, in violation of 29 U.S.C. §§ 206 and 216.

92.     Upon information and belief, Defendants failed to display, in a place accessible to Plaintiff and in a visually conspicuous manner, the notices of employee rights to receive wages and overtime pay required under the FLSA.  29 C.F.R. § 516.4.

93.     Defendants' willful and intentional failure to pay Plaintiff the minimum wage violates 29 U.S.C. § 201, *et seq.*, and United States Department of Labor regulations.

94.     Defendants did not act in good faith when they failed to comply with the federal minimum wage law and only paid Plaintiff approximately $24,000 per year over the course of his employment.

95.     Plaintiff is entitled to an award of damages for unpaid minimum wages in amounts equal to the proper federal minimum wage he should have been paid, plus liquidated damages, attorneys' fees, and costs in amounts to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### New York State Minimum Wage Law
### N.Y. Lab. L. §§ 190 et seq. and 650 et seq.

96.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

97.     At all times relevant to this action, Plaintiff was employed by Defendants within the meaning of N.Y. Lab. L. §§ 2 and 651.

98.     At all times relevant to this action, Defendants were employers within the meaning of the New York Labor Law.

99.     Over the course of Plaintiff's employment, Defendants failed to pay Plaintiff the proper minimum wage, as required by New York Labor Law.  N.Y. Lab. L. § 650 *et seq.*

100.    Upon information and belief, Defendants failed to display, in a place accessible to employees and in a visually conspicuous manner, the notices of employee rights and to receive wages and overtime pay as is required under the New York Labor Law.  N.Y. Lab. L. § 680(3); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.8.

25

101.     Defendants knowingly, willfully, and intentionally failed to maintain accurate records and failed to account for all hours Plaintiff regularly worked, as they were required to do by law.  N.Y. Lab. L. § 195.

102.     Defendants' failure to pay Plaintiff the minimum wage was willful and/or in bad faith.

103.     Plaintiff is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage he should have been paid, plus liquidated damages, attorneys' fees, and costs.

## FIFTH CLAIM FOR RELIEF

### New York State Overtime Law
**N.Y. Lab. L. §§ 190 et seq. and 650 et seq.; N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2**

104.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

105.     Defendants failed to pay Plaintiff overtime premiums for his work in excess of forty-four (44) hours per week, as required for a residential employee in violation of N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.* and New York Department of Labor regulations, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

106.     Defendants' failure to pay Plaintiff overtime pay was willful and/or in bad faith.

107.     Plaintiff is entitled to an award of damages for overtime pay for work over forty-four (44) hours per week in an amount equal to the proper overtime premiums he should have been paid, plus liquidated damages, attorneys' fees, and costs in amounts to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### New York Labor Law, Spread of Hours Pay
### N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4

108.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

109.    Defendants failed to pay Plaintiff one extra hour's pay for every day in which the interval between the beginning and end of Plaintiff's work day exceeded ten hours, in violation of N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.* and New York State Department of Labor regulations, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4.

110.    Defendants' failure to pay Plaintiff spread of hours pay was willful and/or in bad faith.

111.    Plaintiff is entitled to an award of an extra hour's pay for every day that Plaintiff worked in excess of ten hours, liquidated damages, attorneys' fees, and costs in amounts to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### New York State Labor Law, Frequency of Payments
### N.Y. Lab. L. § 191(1)(a)(i)

112.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

113.    New York Labor Law requires employers to pay manual laborers each week, and to pay promised wages for every hour worked.  N.Y. Lab. L. §§ 190, 191, *et seq.*

114.    Plaintiff did not receive payment of wages for hours worked within seven calendar days after the end of the week in which the wages were earned, in violation of N.Y. Lab. L. § 191(1)(a)(i).

27

115.    Defendants' failure to pay Plaintiff the promised wages was willful and/or not in good faith.

116.    Plaintiff is entitled to his promised wages, plus liquidated damages, attorneys' fees, and costs in amounts to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### New York State Labor Law, Notice and Record-Keeping, N.Y. Lab. L. § 195

117.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

118.    Employers are required to provide, at the time of hire and each subsequent year of employment, notice of the employee's rights to receive minimum wage and overtime at a rate of one and one-half their regular rate.  N.Y. Lab. L. § 195.

119.    Employers are also required to obtain, yearly from employees, written acknowledgement that such notice was provided. N.Y. Lab. L. § 195.

120.    Defendants failed to provide Plaintiff the requisite notice of his rights to receive minimum wage and overtime pay and failed to obtain written acknowledgement from Plaintiff of such notice, thus entitling Plaintiff to damages of fifty dollars for each work week that he did not receive the notice required by N.Y. Lab. L. § 195(1)(a) and one hundred dollars for each work week that he did not receive the notice required by N.Y. Lab. L. § 195(3), together with costs and reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

### Fraudulent Misrepresentation

121.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

122.    Prior to Plaintiff's arrival in the United States, Defendants represented to him that he would be one of two personal drivers and would have time to rest between shifts.

123.    Defendants further represented that Plaintiff would have one day off per week and would work forty hours per week.

124.    The above employment conditions constituted material facts related to Plaintiff's employment and his claims.

125.    As set forth herein, Defendants did not fulfill their promises.  Instead, Defendants required Plaintiff to be on call constantly, often forcing him to work up to twenty hour days, seven days per week.

126.    From the beginning, Defendants never intended to limit Plaintiff's work to forty hours per week, but rather intended to subject him to trafficking and forced labor in violation of federal, state, and common law.

127.    Plaintiff justifiably relied on Defendants' misrepresentations in deciding to leave his life, job and family in Madagascar to work in the United States.

128.    Plaintiff's justifiable reliance on Defendants' false representations caused injuries to him, including, among others, lost wages and physical and mental health problems.

129.    Defendants committed the acts alleged in this Complaint maliciously and knowingly misrepresented material facts related to Plaintiff's employment, with the intention of injuring Plaintiff.  Defendants acted with an improper and malicious motive in conscious disregard

29

of Plaintiff's rights, entitling Plaintiff to recover punitive damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF

### Breach of Contract
### (Against Amb. Zinsou)

130.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

131.    Plaintiff and Amb. Zinsou entered into a written agreement, whereby Plaintiff agreed to work for Amb. Zinsou, who agreed to pay Plaintiff $1,900 in salary and $160 as a subservice premium per month, as well as overtime pay.  Amb. Zinsou also agreed to pay Plaintiff every two weeks.

132.    Amb. Zinsou contracted to provide medical insurance through the Mission, and provided leave including one day of rest each week, thirty days of vacation time after one year of service, and time off for public holidays.

133.    Amb. Zinsou agreed to provide dignified human treatment to Plaintiff.

134.    As set forth herein, Amb. Zinsou breached the terms of the Parties' Employment Contract, including without limitation the restriction that Plaintiff work no more than 40 hours, have one day off per week, accrue vacation time, and other provisions.

## ELEVENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Ms. Zinsou-Fatimabay and in the alternative against Amb. Zinsou)

135.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

30

136.     As set forth herein, Plaintiff rendered services as a personal driver to Ms. Zinsou-Fatimabay, in good faith and with the expectation that he would be fairly compensated for the services provided.

137.     As set forth herein, Ms. Zinsou-Fatimabay accepted services and failed to compensate Plaintiff for the reasonable and/or fair market value of his services.  Ms. Zinsou-Fatimabay also received payment for her own transportation from Plaintiff through coercion.

138.     Ms. Zinsou-Fatimabay were unjustly enriched because Plaintiff worked for Ms. Zinsou-Fatimabay without receiving adequate compensation given the number of hours he worked.

139.     Ms. Zinsou-Fatimabay received the benefit of Plaintiff's unpaid labor through fraudulent and unconscionable conduct.

140.     In the absence of a valid contract between Mr. Ravelombonjy and Amb. Zinsou, the allegations asserted in paragraphs 135-139 would also apply to Amb. Zinsou.

141.     Equity and good conscience require that Plaintiff receive restitution.

## TWELFTH CLAIM FOR RELIEF

**Quantum Meruit**
**(In the Alternative against Ms. Zinsou-Fatimabay and Amb. Zinsou)**

142.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

143.     As set forth herein, Plaintiff rendered services as a personal driver to Ms. Zinsou-Fatimabay, in good faith and with the expectation that he would be fairly compensated for the services provided.

144.    As set forth herein, Ms. Zinsou-Fatimabay accepted services and failed to compensate Plaintiff for the reasonable and/or fair market value of his services.  Ms. Zinsou-Fatimabay also received payment for her own transportation from Plaintiff through coercion.

145.    Ms. Zinsou-Fatimabay was unjustly enriched because Plaintiff worked for her without receiving adequate compensation given the number of hours he worked.

146.    Ms. Zinsou-Fatimabay received the benefit of Plaintiff's unpaid labor through fraudulent and unconscionable conduct.

147.    In the absence of a valid contract between Mr. Ravelombonjy and Amb. Zinsou, the allegations asserted in paragraphs 142-146 would also apply to Amb. Zinsou.

148.    Equity and good conscience require that Plaintiff receive restitution.

## THIRTEENTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

149.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

150.    As set forth herein, Defendants unreasonably endangered plaintiff's physical safety, caused him to fear for his own safety and caused him to suffer severe emotional distress.

151.    Defendants owed a duty to Plaintiff because it was foreseeable that forcing a domestic worker to work 16 or more hours per day and subjecting him to physical harm and threats of physical harm and deportation, would cause Plaintiff to suffer severe emotional distress.

152.    Defendants breached their duty to Plaintiff by negligently engaging in the conduct described herein.

153.    As a direct and natural result of Defendants' conduct, Plaintiff has suffered and continues to suffer extreme mental distress, humiliation, and emotional injuries.

32

154.    As a direct and natural result of Defendants' conduct, Plaintiff has suffered physical and psychological injuries.

155.    As a direct and natural result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations set forth above and/or additional facts that will be revealed through discovery, Plaintiff respectfully requests that a judgment be granted as follows:

1.    Awarding Plaintiff compensatory and punitive damages, the reasonable and/or fair market value of services provides to Defendants, attorneys' fees and costs, and such other relief as the Court may deem just and proper pursuant to the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §§ 1589, 1590, 1595.

2.    Awarding Plaintiff unpaid minimum wages, plus liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 201 *et seq.*;

3.    Awarding Plaintiff unpaid wages, including promised wages, minimum wages, overtime pay, and spread-of-hours pay, plus liquidated damages, interest, attorneys' fees and costs, pursuant to New York Labor Law §§ 190, *et seq.*; 650 *et seq.*;

4.    Awarding Plaintiff compensatory and punitive damages as permitted by law;

5.    Awarding Plaintiff pre-judgment interest and post-judgment interest as allowed by law;

6.    Awarding Plaintiff the reasonable and/or fair market value of services provided to Defendants in good faith pursuant to Plaintiff's equitable claims of unjust enrichment or quantum meruit;

33

7.      Directing Defendants to turn over all other personal belongings of Plaintiff remaining in Defendants' control, and awarding Plaintiff compensatory and punitive damages due to the their failure to give Plaintiff access to his passport, bank account, and earned wages; and

8.      Awarding Plaintiff such other legal and equitable relief as the Court may deem just and proper.

Dated: New York, New York
      August 23, 2019

Respectfully submitted,

By: _/s/ Noah Leibowitz_ _____

DECHERT LLP
Noah M. Leibowitz
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: 212-698-3500
Facsimile: 212-698-3599
Email: noah.leibowitz@dechert.com

Amisha R. Patel
Eric Auslander
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
Email: amisha.patel@dechert.com
eric.auslander@dechert.com

*Attorneys for Plaintiff Manasay Hardy Raveleombonjy*