UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANASAY HARDY RAVELOMBONJY,

                    Plaintiff,

         – against –

COLETTE ZINSOU-FATIMABAY *and*
ANDRY ZINSOU, *co-executors for the*
*estate of Jean Francis Zinsou*, *and*
COLETTE ZINSOU-FATIMABAY,

                    Defendants.

**OPINION & ORDER**

19 Civ. 7025 (ER)

RAMOS, D.J.:

        Manasay Hardy Ravelombonjy brings this action against the late Ambassador Jean Francis Zinsou, former Permanent Representative of the West African nation of Benin to the United Nations ("Amb. Zinsou"), and his wife Colette Zinsou-Fatimabay,[1] alleging that the defendants trafficked and otherwise subjected him to mistreatment, abuse, inhumane working hours, and threats of deportation.  Doc. 9.  Before the Court is the defendants' motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7).  Doc. 63.[2]  For the reasons set forth below, the motion is denied.[3]

---

[1] Colette Zinsou-Fatimabay and the Zinsous' son Andry Zinsou are co-executors of Amb. Zinsou's estate.

[2] The title of the defendants' motion states that it is a motion to quash service.  *See* Doc. 63.  However, nowhere in their papers do the defendants make any argument, or even mention, why service should be quashed in this case.  Thus, the Court does not address this issue.

[3] The defendants request that the Court order the Clerk of Court to amend the defendants in the case caption to "Colette Zinsou-Fatimabay and Andry Zinsou as the Co-Executors of the Estate of Jean-Francis Zinsou, and Colette Zinsou-Fatimabay."  Doc. 63 at 2.  Accordingly, the Clerk of Court is respectfully directed to amend the case caption.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Background

Ravelombonjy, a 30-year-old resident of the State of New York and a citizen of Madagascar, ¶¶ 1, 10,[4] was "lured" from his home in Madagascar to the United States when Amb. Zinsou, a citizen of Benin, *id.* ¶ 15, and Ravelombonjy's paternal aunt, Ms. Zinsou-Fatimabay, a citizen of Madagascar, *id.* ¶ 16, offered him the opportunity to work as a driver for Amb. Zinsou.  *Id.* ¶ 1.  However, throughout the course of his employment, he was subjected to brutal working conditions, inhumane hours, threats related to his job security and immigration status, forced labor, and abuse.  *Id.* ¶¶ 1–2.  Not only did his physical and mental health deteriorate as a result of his employment, but he was not paid minimum wage, overtime compensation, and spread-of-hours pay.  *Id.* ¶¶ 1–2, 4.

In early 2012, Ms. Zinsou-Fatimabay contacted Ravelombonjy's father about an employment opportunity in New York as a driver for her husband, Amb. Zinsou, the then-Permanent Representative of Benin to the United Nations.  *Id.* ¶ 21.  The defendants persuaded Ravelombonjy that this opportunity would allow him to provide a better future for his family.  *Id.* ¶ 22.  Furthermore, the defendants informed him that Amb. Zinsou would hire two drivers, so that they could alternate shifts and take time off.  *Id.* ¶ 23.

In late 2012, Ravelombonjy's father provided him with an employment contract from the defendants.  Doc. 9-1.  In September 2012, Ravelombonjy signed the contract.  ¶ 24.  In preparation for his employment, he procured a passport, which was issued on October 12, 2012, and applied for a United States tourist visa.  *Id.*  He then received the executed contract signed by Amb. Zinsou and dated November 14, 2012.  *Id.*

The employment contract listed Ravelombonjy as "the contracting employee" and Amb. Zinsou as "the employer."  Doc. 9-1 at 8.  In addition to Amb. Zinsou's signature, two individuals working for the Permanent Mission of the Republic of Benin to the

---

[4] Unless otherwise noted, citations to "¶ _" refer to the Amended Complaint, Doc. 9.

United Nations ("the Mission") signed beneath the employee and employer signatures. Doc. 9-1 at 13. The contract appears to be on the Mission's letterhead and is affixed with the Mission's seal. Doc. 9-1 at 2, 7. The contract stated that Ravelombonjy would work 40 hours per week and receive a payment of $1,900 per month plus a $160 subservice premium, which the defendants characterize as "hardship compensation," Doc. 64 at 21, health insurance, paid sick leave, premium compensation of overtime worked, 30 days of vacation leave after one year of employment, and other benefits. ¶¶ 25–28; Doc. 9-1 at 9, 10, 12. The Mission issued and Amb. Zinsou signed Ravelombonjy's checks. ¶ 61.

Ravelombonjy was issued a G-5 visa, which is issued to personal employees, attendants, domestic workers, or servants of aliens, on March 15, 2013. *Id.* ¶ 24. Ms. Zinsou-Fatimabay arranged and paid for his travel to the United States from Madagascar and required that he agree to repay her for the cost of the flight. *Id.* ¶ 30. He re-paid the defendants for his travel costs over a five-month period. *Id.* Upon his arrival in the United States on or about April 30, 2013, and until his "escape" from the defendants' custody in August 2016, Ravelombonjy lived in the basement of the defendants' residence in the Bronx, New York. *Id.* ¶¶ 11–12, 33.

After his arrival, Ravelombonjy underwent two weeks of training during which he accompanied Amb. Zinsou's then-driver, Rene Dalum, to familiarize himself with New York, including the route from the defendants' residence to the Mission and the United Nations. *Id.* ¶ 32.

Approximately three weeks after his arrival, Amb. Zinsou directed Ravelombonjy to give his passport and the original copy of his employment contract to the Protocol Officer of the Mission, Marcelin Yevide. *Id.* ¶ 31. The passport was returned to him after approximately three months. *Id.*

On or about May 2, 2013, Ravelombonjy requested the weekend off, because Amb. Zinsou was not working and did not require a driver. *Id.* ¶ 36. Although Amb. Zinsou granted the request, Ms. Zinsou-Fatimabay called Ravelombonjy, stating that she

disliked people from Madagascar and threatening him with punishment for going to Albany. *Id.* When he returned from his trip, the defendants threatened to send him back to Madagascar if he continued to communicate with people from Madagascar. *Id.*

Amb. Zinsou signed his employment certification from the Mission on May 15, 2013, when his training ended, and he began working full-time on or about May 16, 2013. *Id.* ¶ 32.

Although his work hours were relatively normal at the outset, after the first month, the defendants began relying solely on him to drive them "any time they requested," and thus, his job "consisted of taking Amb. Zinsou to the United Nations in the morning, and driving [the] [d]efendants throughout the day." *Id.* ¶ 34. The defendants "made their expectations clear that [ ] Ravelombonjy was required to drive both Amb. Zinsou and his wife wherever and whenever needed, even for non-Mission related purposes." *Id.* They also "forced [ ] Ravelombonjy to drive their other family and friends[.]" *Id.* During the course of his employment, the defendants had the power to fire him, set his schedule, supervise him, and control his work conditions. *Id.* ¶¶ 56–59.

While the Mission maintained logs of other employees' work hours, no such records were kept for Ravelombonjy. *Id.* ¶ 37. When Ravelombonjy asked Amb. Zinsou about this, Amb. Zinsou told him that the work records were "in his head," and that he did not need any written work records. *Id.* Therefore, Ravelombonjy kept his own work log to track his hours. *Id.*

Amb. Zinsou's behavior was "often erratic and frightening," as he would react aggressively and have physical outbursts while Ravelombonjy was driving if Ravelombonjy refused to drive faster and disobey speed limits. *Id.* ¶ 35.

In mid-July 2013, the defendants began requiring him to drive or otherwise be available between 7:00 a.m. to 2:00 a.m., seven days a week, while paying him the same amount. *Id.* ¶¶ 4, 38. During the course of his employment covering approximately 39 months, he had fewer than ten days off. *Id.* ¶ 4. As a result, he had insufficient time to

4

sleep, seek medical care when he was ill, prepare meals, or perform other basic tasks necessary to maintain a mediocre standard of living. *Id.* ¶ 38. While the defendants never required him to live at their residence, the hours that he was forced to work made living off the premises impossible. *Id.* ¶ 33. The defendants demanded that the domestic workers share a bathroom, refused his request to add a lock to his bedroom door, and provided limited access to the kitchen. *Id.* In addition, on numerous occasions, the defendants searched his room and opened his mail without his permission. *Id.* ¶ 47.

On one occasion, after Ravelombonjy drove Amb. Zinsou back to the residence at approximately 2:00 a.m., Amb. Zinsou stated that they needed to leave at 7:00 a.m. *Id.* ¶ 46. When Ravelombonjy expressed that these hours were unsustainable, Amb. Zinsou told him that "he had no rights, and that he was not really in the United States, but was in Benin because he worked for the Ambassador." *Id.* During this exchange, Amb. Zinsou made a fist as if he were ready to punch Ravelombonjy. *Id.* After this incident, Ravelombonjy's fear of the defendants caused him to remain silent about his increasingly unbearable working conditions. *Id.*

At times, both Amb. Zinsou and Ms. Zinsou-Fatimabay requested rides to different places at the same time. *Id.* ¶ 38. When Ravelombonjy prioritized Amb. Zinsou, Ms. Zinsou-Fatimabay demanded that he reimburse her for her taxi rides. *Id.* He reimbursed her, because he was scared that he had no choice but to pay. *Id.*

Upon his arrival, the defendants initially gave him a cell phone so that he could be available and on call for ride requests. *Id.* ¶ 40. In September 2013, however, the defendants forced him to purchase a new phone with his own money. *Id.* As a result of the long hours and inadequate wages, he was only able to communicate with his wife approximately once a week. *Id.* He never spoke to his family in front of the defendants. *Id.*

In February 2014, during a massive snowstorm, Amb. Zinsou forced Ravelombonjy to drive them home from the Mission. *Id.* ¶ 43. When they arrived at the

defendants' residence, much of the house was snowed in. *Id.* Amb. Zinsou forced Ravelombonjy to shovel the snow despite his not having the proper clothing and footwear. *Id.* After approximately two hours of shoveling, Ravelombonjy walked into the house shivering and crying. *Id.* Amb. Zinsou laughed at and took photographs of him. *Id.* He warned Ravelombonjy not to claim he was sick the next day. *Id.*

In May 2014, Ms. Zinsou-Fatimabay charged Ravelombonjy a fee for access to the refrigerator in the kitchen. *Id.* ¶ 41. After paying the fee for approximately one month, Ravelombonjy found a discarded miniature refrigerator on the road for his personal use. *Id.* In light of his long hours, he was unable to prepare meals and was often forced to purchase food from a nearby restaurant. *Id.*

During his employment, Ravelombonjy's physical and emotional health deteriorated. *Id.* ¶ 42. He fainted from exhaustion, experienced shaking and hunger, and suffered from anxiety. *Id.* He also developed pre-diabetes. *Id.* On one occasion, when he could not complete a ride for Ms. Zinsou-Fatimabay due to anxiety and chest pains, she demanded that he reimburse her for a payment she made to another employee who ultimately drove her. *Id.* He was taken by ambulance to the hospital. *Id.* He stayed in the hospital for one day then rested for three days at a friend's house, because he feared that the defendants would force him to work if he remained at their residence, before resuming his work schedule. *Id.* On another occasion in 2015, Ravelombonjy collapsed in his room. *Id.* ¶ 44. The defendants barged in and told him that they were not paying him to sleep. *Id.* Fearing that Amb. Zinsou would terminate him if he took time to rest, Ravelombonjy returned to work the next day. *Id.*

On another occasion, he developed a painful abscess on his right arm, but was unable to seek medical attention due to his long hours. *Id.* ¶ 45. The pain became so severe that Ravelombonjy began to effectively drive with his other hand. *Id.* Amb. Zinsou ignored his request for time off to obtain medical treatment. *Id.* However, Amb. Zinsou's guest noticed Ravelombonjy's arm and suggested that he seek medical attention.

*Id.*  At this point, Amb. Zinsou permitted him to do so.  *Id.*  Ravelombonjy underwent a surgical procedure to remove the abscess and returned to the defendants' residence after an overnight stay in the hospital.

In February 2016, Ravelombonjy began recording his conversations with the defendants on his cell phone, so that he could confirm the instructions he was given.  *Id.* ¶ 48.  In April 2016, during a disagreement with Ms. Zinsou-Fatimabay, Ravelombonjy told her that he had been recording their conversations, because the defendants would tell him certain instructions then change their requests.  *Id.*  Approximately one week later, Amb. Zinsou demanded that Ravelombonjy produce his cell phone at the Mission.  *Id.* Amb. Zinsou accused Ravelombonjy of making the recordings to build a case against the defendants and demanded that he transfer these recordings to the computer at the Mission.  *Id.*  Amb. Zinsou threatened to withhold his support for renewing Ravelombonjy's expiring visa and to involve U.S. authorities and Beninese military leadership.  *Id.*  Amb. Zinsou called Awali Imorou, the then-Protocol Officer of the Mission, to act as a witness.  *Id.*  Amb. Zinsou returned the cell phone and instructed the Protocol Officer to transfer the recordings to a computer and delete them from the phone. *Id.*

Ravelombonjy's G-5 visa was set to expire on April 28, 2016.  *Id.* ¶ 49.  Three months prior to his visa's expiration date, he asked both Amb. Zinsou and the Head of Chancery at the Mission to ensure his immigration status remained up to date, but each person insisted that Ravelombonjy's visa renewal was the other person's responsibility. *Id.*  After Ravelombonjy's repeated requests, Amb. Zinsou informed him that his G-5 visa would not be renewed.  *Id.*  Instead, at some point thereafter, the Protocol Officer informed him that the Mission would attempt to change his immigration status from a G-5 to a G-1 visa, such that he would be employed by the Mission directly, rather than by Amb. Zinsou.  *Id.*  Ravelombonjy alleges upon information and belief, that the

defendants sought to change his immigration status to ensure that he was no longer a direct employee of Amb. Zinsou.  *Id.*

Around the same time, Amb. Zinsou insisted that Ravelombonjy sign a new employment contract, which listed the Mission as his employer and provided that Ravelombonjy would be a driver for members of the Mission and other officials, and not just for the Ambassador.  *Id.* ¶ 50; Doc. 9-3.  The Mission and the defendants submitted an application to the United States Citizenship and Immigration Services to change Ravelombonjy's immigration status to a G-1 visa on May 23, 2016, approximately one month after his G-5 visa expired.  ¶ 50; Doc. 9-2.

On June 7, 2016, the United States Mission to the United Nations denied the G-1 visa application on the grounds that Ravelombonjy needed to return to Madagascar first if he wished to change his visa from a G-5 to a G-1 visa.  ¶ 51; Doc. 9-2 at 2 ("We are unable to accept the registration as a Driver for the Permanent Mission . . . because Mr. Ravelombonjy's current G-5 visa status was determined by a United States Consular Officer in March 2013 to be appropriate only for his position as the personal Chauffeur of the Ambassador.").

In July 2016, when Ravelombonjy requested one day off after working a seven-day week, Amb. Zinsou warned him to stop making such requests and threatened to terminate him.  ¶ 39.  Throughout his employment, the defendants told Ravelombonjy that if he did not work, he would be fired and either have to find another job or go back to Madagascar.  *Id.*  Furthermore, the defendants told his family in Madagascar that he may be terminated because of his poor performance, which caused him great embarrassment and prevented him from being able to confide in his family about his mistreatment.  *Id.*

On July 26, 2016, Ravelombonjy filed a minimum wage and overtime complaint as a domestic worker with the New York State Department of Labor (NYDOL).  *Id.* ¶ 52; Doc. 9-4.  On July 27, 2016, Amb. Zinsou notified Ravelombonjy that he would be terminated on August 31, 2016.  ¶ 52; Doc. 9-5.

On August 10, 2016, Ravelombonjy called Rebecca de Simone, Director of the Human Trafficking Program at My Sisters' Place, a non-profit organization that assists victims of human trafficking.  ¶ 53.  Ms. de Simone concluded that his circumstances met several criteria for human trafficking.  *Id.*  My Sisters' Place helped him move into a shelter, where he received various health referrals, counseling, and emergency financial assistance.  *Id.*[5]  As a result, Ravelombonjy lost possession of his computer in the defendants' residence.  *Id.*  My Sisters' Place subsequently referred his case to the New York State Division of Criminal Justice Services and Office of Temporary and Disability Assistance.  *Id.* ¶ 54.

Amb. Zinsou left his post at the Mission on September 14, 2016, which is almost three years before this action was filed on July 26, 2019.  Doc. 66 Ex. 1 at 6.  On April 10, 2017, the NYDOL notified Amb. Zinsou that he owed Ravelombonjy $69,090.88 in unpaid overtime wages.  ¶ 52; Doc. 9-6.[6]  On July 21, 2017, New York State confirmed Ravelombonjy's status as a victim of human trafficking.  ¶ 54; Doc. 9-7.  Amb. Zinsou died in July 2020.  Doc. 37-1 at 3.

### B.    Procedural Background

Ravelombonjy commenced this action against Amb. Zinsou and Ms. Zinsou-Fatimabay on July 26, 2019.  Doc. 1.  He amended his complaint on August 23, 2019.  Doc. 9.  He brought claims under the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), 18 U.S.C. §§ 1589, 1590, 1595, for forced labor and trafficking; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for minimum wage violations; and New York State Labor Law ("NYLL"), N.Y. Labor Law § 190 *et seq.*, for

---

[5] In his opposition, Ravelombonjy alleges that he "escaped" from the defendants in August *2015*.  Doc. 67 at 8.  The defendants point to this date as evidence that Ravelombonjy is lying, because his employment ended in July 2016.  However, because Ravelombonjy alleges in the Amended Complaint that he escaped the defendants' residence in August 2016, ¶ 12, the Court construes August 2015 to be a typographical error.

[6] The defendants argue that the NYDOL addressed Amb. Zinsou in its finding that he owed Ravelombonjy overtime wages only because Ravelombonjy filed the complaint against Amb. Zinsou, not the Mission.

minimum wage, overtime compensation, spread of hours pay, frequency of payment, and notice and recordkeeping violations. *Id.* He also asserts New York state law claims for fraudulent misrepresentation, breach of contract, unjust enrichment, quantum meruit, and negligent infliction of emotional distress. *Id.*

The Court authorized alternative service of process on August 12, 2020, as Ravelombonjy had engaged in good faith efforts to identify the location of the defendants' residence without success. Doc. 33. On May 20, 2021, Ravelombonjy filed a motion to substitute Andry Zinsou and Ms. Zinsou-Fatimabay as co-executors for the estate of Amb. Zinsou. Doc. 40. The Court instructed that the defendants' response, if any, was due by no later than May 28, 2021. Doc. 44. As of October 1, 2021, neither Ms. Zinsou-Fatimabay nor Andry Zinsou had filed an opposition, nor had they appeared in the case. Thus, the Court granted Ravelombonjy's motion. Doc. 45. The defendants appeared in the action on October 26, 2021 by way of a request for an extension of time to respond to the Amended Complaint. Doc. 53.

The defendants filed their original motion to dismiss on November 29, 2021. Doc. 56. On December 2, 2021, the parties notified the Court that with Ravelombonjy's consent, the defendants planned to amend their motion to dismiss. Doc. 60. The defendants filed the instant motion to dismiss on December 6, 2021. Doc. 63.

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(1):  Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction,

evidence outside of the pleadings may be considered by the court to resolve the disputed jurisdictional fact issues. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (internal citation omitted); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113). When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not necessarily draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012) (internal citations omitted), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Chambers v. Wright*, No. 05 Civ. 9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)).

### B.      Rule 12(b)(6): Failure to State a Claim

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

"[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Green v. Beer*, No. 06 Civ. 4156 (KMW) (JCF), 2009 WL 3401256, at *2 (S.D.N.Y. Oct. 22, 2009) (citing *Iqbal*, 556 U.S. at 678).  Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### C.      Rule 12(b)(7):  Failure to Join an Indispensable Party

Rule 19 "sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party," and the burden of showing that a party is indispensable is on the moving party.  *Greenwich Life Settlements, Inc. v. Viasource Funding Grp., LLC*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010) (quoting *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000)); *King v. Pine Plains Cent. Sch. Dist.*, 918 F. Supp. 772, 782 (S.D.N.Y. 1996).

"First, the court must determine whether an absent party . . . qualifies as a 'necessary' party under Rule 19(a)." *Greenwich Life Settlements, Inc.*, 742 F. Supp. 2d at 455 (citing *Viacom Int'l, Inc.*, 212 F.3d at 724).  If the criteria in Rule 19(a) are met, the absent party must be joined.  *Id.*  An absent party is necessary to a litigation if "the court

cannot accord complete relief among existing parties," or the absent party "claims an interest relating to the subject of the action and is so situated that disposing of the action in [that party's] absence may" either "(i) as a practical matter impair or impede [the absent party's] ability to protect the interest or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." *Id.* at 456 (citing Fed. R. Civ. P. 19(a)(1); *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999)).

If joinder of the party is not feasible, the court must assess under the second step in Rule 19(b) "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.*; *see also Jota v. Texaco, Inc.*, 157 F.3d 153, 162 (2d Cir. 1998). "[O]nly where the Court makes a finding that a party is necessary will it continue to the second inquiry." *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 137 (E.D.N.Y. 2000); *see also Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990) (*per curiam*).

"Federal courts are extremely reluctant to grant motions to dismiss based on non-joinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result." *Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.*, 795 F.3d 351, 357 (2d Cir. 2015) (quoting 7 Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1609 (3d ed. 2015)).

## III.   DISCUSSION

### A.   Lack of Subject Matter Jurisdiction

Under 22 U.S.C. § 254d, a court must dismiss "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the [Vienna Convention on Diplomatic Relations ("VCDR")]." "This statutory dictate is consistent with the [VCDR] itself, which provides that a 'diplomatic agent shall enjoy immunity from the criminal . . . civil and administrative jurisdiction' of the receiving state." *Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 2010) (quoting

VCDR Art. 31(1)).  "Although diplomats enjoy broad immunity pursuant to the [VCDR] from civil and criminal process, diplomats lose much of their immunity following the termination of their diplomatic status."  *Id.* (internal citations omitted).

Pursuant to Article 39(2) of the VCDR, former diplomats are eligible for "residual" immunity, a more limited and less expansive form of immunity than that provided to current diplomats in Article 31(1) of the VCDR.  "Specifically, once a diplomat becomes a 'former' diplomat, he or she is not immune from suit for prior acts unless those acts were performed 'in the exercise of [the former diplomat's] functions as a member of the mission.'"  *Id.* at 134 (quoting VCDR Art. 39(2)).

Amb. Zinsou was the Permanent Representative of Benin to the United Nations until September 14, 2016, nearly three years before this action was filed on July 26, 2019.  Doc. 66 Ex. 1 at 6.  The parties do not dispute that Amb. Zinsou's diplomatic immunity is governed by Article 39(2)'s provision of residual immunity.[7]

Because Amb. Zinsou was the Permanent Representative of Benin to the United Nations, he is eligible for the residual immunity articulated by Article 39(2), but only for acts he performed "in the exercise of his functions as a member of the mission."  *Baoanan v. Baja*, 627 F. Supp. 2d 155, 161 (S.D.N.Y. 2009) (quoting VCDR Art. 39(2)); *see also Swarna*, 622 F.3d at 134.  "Article 39(2) does not immunize acts that are 'incidental to' the exercise of his functions as a member of the mission."  *Swarna*, 622 F.3d at 134.  Because this immunity exists not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions, residual immunity "does not apply to actions that pertain to [the diplomat's] household or personal life and that may provide, at best, 'an indirect' rather than a 'direct . . . benefit to' diplomatic functions."  *Id.* at 134–35 (citations omitted).  While the act of "hiring and employing an

---

[7] Ravelombonjy argues, and the defendants do not dispute, that Ms. Zinsou-Fatimabay is not subject to any immunity.  *See Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (finding that the wife of a diplomat was not entitled to residual diplomatic immunity under VCDR Art. 39(2)); *Baoanan v. Baja*, 627 F. Supp. 2d 155, 161 (S.D.N.Y. 2009) (same).

individual to work at the diplomatic mission" is considered to be an official act, courts have recognized that "residual diplomatic immunity does not extend to lawsuits based on actions that were entirely peripheral to the diplomatic agent's official duties." *Baoanan*, 627 F. Supp. 2d at 163–64 (citations omitted).

Before the Court is the question of whether the employment and treatment of Ravelombonjy constituted official acts under Article 39(2) of the VCDR. Ravelombonjy's claims fall into two categories. The first set of claims, which are based on employment and labor law, address alleged violations arising out of his employment as a domestic worker for the defendants. The claims include: violations of minimum wage, overtime, spread of hours, frequency of payment, and notice and recordkeeping; fraudulent misrepresentation; breach of contract; unjust enrichment; quantum meruit; and negligent infliction of emotional distress. *See id.* at 164–65.

The second set of claims, which do not arise out of Ravelombonjy's provision of services to the defendants as a domestic worker, address the defendants' alleged actions to induce Ravelombonjy to travel from Madagascar to the United States. The claims include: forced labor and trafficking with respect to peonage, slavery, involuntary servitude, or forced labor. *Id.* at 165.

Because these two sets of claims implicate different issues as to whether the defendants' alleged acts were official, the Court addresses each set separately. *Id.*

### i.   *Employment Claims*

The defendants argue that Ravelombonjy was employed to assist Amb. Zinsou in the exercise of his mission-related functions, specifically Ravelombonjy was hired to drive Amb. Zinsou to and from the Mission and the United Nations, and therefore, all acts arising from this employment relationship are immune from suit under the VCDR. In opposition, Ravelombonjy contends that he was Amb. Zinsou's personal chauffeur, *not* a driver for the Mission. Furthermore, Ravelombonjy concedes that while he performed some work related to Amb. Zinsou's commute to the Mission, the United Nations, and

related government functions, these tasks, when viewed in light of his employment contract, visa status, and responsibilities, were tangential to his employment of serving the defendants' private needs.

Courts have recognized that while many domestic workers hired by diplomatic agents are "routinely employed and assigned to provide services related solely to the official functions of the mission . . . [a] diplomat could also employ and pay staff to perform personal or private tasks for the diplomat or the diplomat's family that the sending State would not recognize as ordinary or necessary to the official functioning of the mission and for which it would not provide compensation." *Id.* Therefore, to determine whether the employment of a domestic worker is official or private, courts examine the circumstances surrounding the defendants' alleged acts.

*First*, as to Ravelombonjy's visa type, he contends that his G-5 visa classification is evidence that he was a *personal* employee for the defendants, as opposed to the Mission. "Recipients of the G-5 visa are 'aliens employed in a domestic or personal capacity by a principal alien, who are paid from the private funds of the principal alien and seek to enter the United States solely for the purpose of such employment.'" *Swarna*, 622 F.3d at 138 (quoting 22 C.F.R. § 42.21(a)(4)) ("[The plaintiff's] [G-5 visa] status reflected precisely her occupation in the United States: a personal servant hired to meet the individual defendants' private needs."). "[T]he Government's regulations regarding G–5 visas state that the recipient of such a visa may be 'an attendant or personal employee of an official or other employee of a diplomatic or consular mission or international organization.'" *Baoanan*, 627 F. Supp. 2d at 167–68 (citation omitted) (finding that the plaintiff's G-5 visa, taken together with other documents, evidenced that the plaintiff was employed by the defendant to perform private, domestic services).

Like the workers in *Baoanan* and *Swarna*, Ravelombonjy entered the United States on a G-5 visa. The defendants argue that the only reason Ravelombonjy was granted a G-5 visa is because each incoming head of the Mission has the right to hire its

16

own staff and replace any staff hired by the previous head, and therefore, the staff's status is tied to that of the head of the Mission.  On June 7, 2016, when Amb. Zinsou attempted to change Ravelombonjy's immigration status to a G-1 visa, the United States Mission to the United Nations denied the request.  Doc. 9-2 at 2 ("We are unable to accept the registration as a Driver for the Permanent Mission . . . because Mr. Ravelombonjy's current G-5 visa status was determined by a United States Consular Officer in March 2013 to be appropriate only for his position as the personal Chauffeur of the Ambassador.").[8]  Therefore, Ravelombonjy's G-5 visa classification weighs in favor of finding that he was a personal employee.

Second, as to the employment contract, Ravelombonjy points to the fact that Amb. Zinsou signed the contract and is defined as the "employer."  ¶ 50; Doc. 9-1 at 8, 13; see also Doc. 9-3 at 10 (subsequent employment contract listing the Mission as his employer).  In contrast, the defendants assert that the agreement (1) assigned almost all obligations to the Mission;[9] (2) was executed by two individuals from the Mission in their official capacity, Doc. 9-1 at 13; (3) was affixed with the seal of the Mission, id. at 7; and (4) was drafted on the Mission's letterhead, id. at 2.[10]  The contract provides that "[t]he [e]mployer engages the [c]ontracting employee in his service in the capacity of Chief of Mission's Driver," and that the employee is "exclusively in the service of his [e]mployer who is the Benin Chief of Mission, Ambassador and Permanent

---

[8] In a letter regarding Ravelombonjy's complaint to the NYDOL, while Amb. Zinsou describes how Ravelombonjy's visa and employment contract implicated the Mission's involvement, Doc. 66 at 62, he also recognized how Ravelombonjy was attached to him personally.  Specifically, he described how, after he was recalled from his position and in an attempt to do Ravelombonjy the favor of renewing his visa, "[i]n order to preserve [Ravelombonjy's] job and especially to allow him to obtain a status that detaches him from my person, I signed a new employment contract making him a Service Driver of the Permanent Mission and assigned to the post of Driver of the Head of Mission . . . ."  Id. at 64.

[9] For example, health insurance costs and sick leave are paid for by the Mission.  Doc. 9-1 at 10.

[10] In their papers, the defendants explain that the contract was a standard template used by the Mission to hire all of its employees.  Doc. 64 at 21; Doc. 75 at 9.  They further contend that each head of the Mission hires its own staff, and those hires are dismissed when a new head is appointed.  Doc. 75 at 5 n.3, 10.

Representative to the United Nations in New York, to make of his work a success." *Id.* at 9.

Ravelombonjy does not dispute that the Mission paid his salary and provided him with health insurance. Doc. 67 at 15. Indeed, the Amended Complaint alleges that the Mission issued and Amb. Zinsou signed his checks. ¶ 61. On the one hand, unlike in *Swarna* and *Baoanan*, Ravelombonjy was not paid by Amb. Zinsou, and the contract does not specify that Ravelombonjy would be providing services for the defendants' personal or private needs. *See Swarna*, 622 F.3d at 138 (finding that the plaintiff was employed by the defendant where she was offered a position as a live-in domestic worker and was paid out of the defendant's private funds, with only some of her expenses being covered by the mission); *Baoanan*, 627 F. Supp. 2d at 168 (holding that the plaintiff was employed to perform private, domestic services where her contract stated that she was hired "as a domestic helper" to cook, clean, and do laundry). On the other hand, the contract provides that Ravelombonjy was not employed by the Mission but by Amb. Zinsou. Doc. 9-1 at 8, 13; *see also Baoanan*, 627 F. Supp. 2d at 170 (finding that the plaintiff was employed by the defendant personally, not the mission, where the contract was entered into by the plaintiff and the defendant). Thus, the employment contract presents a close question.[11]

---

[11] The defendants cite to a number of cases, which are distinguishable. *See Fontaine v. Permanent Mission of Chile to United Nations*, No. 17 Civ. 10086 (AT), 2020 WL 5424156, at *5–6 (S.D.N.Y. Aug. 18, 2020) (finding that officials of the Permanent Mission of Chile to the United Nations were protected by diplomatic immunity against Mission employee's allegations of discrimination, sexual harassment, and retaliation because plaintiff was a Mission employee who brought employment discrimination claims); *Brzak v. United Nations*, 551 F. Supp. 2d 313, 319–20 (S.D.N.Y. 2008) (dismissing for lack of subject matter jurisdiction where United Nations employees brought claims for employment discrimination, retaliation, and sexual harassment against their superiors because plaintiffs were United Nations employees who brought an employment-related suit), *aff'd*, 597 F.3d 107 (2d Cir. 2010); *D'Cruz v. Annan*, No. 05 Civ. 8918 (DC), 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005) (same), *aff'd*, 223 F. App'x 42 (2d Cir. 2007); *Osman v. Annan*, No. 07 Civ. 837 (NKL), 2008 WL 2477535, at *1–2 (W.D. Mo. June 16, 2008) (dismissing for lack of subject matter jurisdiction where United Nations employee brought claims against United Nations official for wrongful discharge because plaintiff was a United Nations employee who brought an employment-related suit). Unlike the plaintiffs in these cases, Ravelombonjy alleges that the defendants were his employers, *not* the Mission.

*Third*, as to Ravelombonjy's living with the defendants, the defendants argue that, unlike the workers in *Swarna* and *Baoanan*, Ravelombonjy was not required to live with them.  Doc. 9-1 at 9.  Indeed, the defendants assert that being permitted to live with them was a significant benefit and essential to his duty to "drive Amb. Zinsou to the Mission and all the United Nations functions he had at the UN or elsewhere."  Doc. 75 at 16. Ravelombonjy alleges that living in the defendants' residence was necessary, because he was "either on call or driving [the defendants] from the early morning until the middle of the night."  ¶ 38.  While it is not, by itself, dispositive, "[p]hysical location should be considered in determining whether an act is official or private."  *Baoanan*, 627 F. Supp. 2d at 169.  Therefore, the fact that Ravelombonjy lived with the defendants weighs slightly in favor of finding that he was employed by them.

*Fourth*, as to Ravelombonjy's services, he asserts that while he may have driven Amb. Zinsou to and from work at the Mission and United Nations functions, he was also responsible for driving Ms. Zinsou-Fatimabay, their children, and their family friends anywhere and at any time.  ¶¶ 34, 38.  The defendants do not appear to dispute this, even recognizing that diplomats organize social events and receive guests often.  Instead, they emphasize that Ravelombonjy's "main job" was to drive Amb. Zinsou to his work functions and be aware of his schedule and commitments, with "[a]ny other errand on the side [being] incidental to his primary role."  Doc. 75 at 17; *see also* Doc. 64 at 16. Although it is not clear how Ravelombonjy's employment was attributed between Amb. Zinsou's diplomatic functions and the defendants' personal needs, Ravelombonjy alleges that he was on call between 7:00 a.m. to 2:00 a.m., seven days a week, and that he was expected to drive the defendants and other individuals for any purpose.  ¶¶ 4, 34, 38.

Courts have recognized that a diplomatic agent's employment of an individual is not an official act "when the employment at issue is not *solely* for the purpose of supporting the diplomatic agent's exercise of his diplomatic functions."  *Baoanan*, 627 F. Supp. 2d at 170 (finding employment was not an official act where the plaintiff was

19

responsible for household duties and childcare, including preparing for and cleaning up after weekly diplomatic parties at the Mission); *see also Swarna*, 622 F.3d at 138 (same where the plaintiff's duties included cooking, cleaning, caring for the defendants' children, as well as providing services for mission employees and official functions). Therefore, notwithstanding the fact that Ravelombonjy drove Amb. Zinsou to and from Mission-related functions, his services "did not benefit the [ ] Mission itself, except tangentially, but rather inured predominantly to the [defendants'] private needs." *Baoanan*, 627 F. Supp. 2d at 169–70; *Swarna*, 622 F.3d at 138. Indeed, in their papers, the defendants concede that Ravelombonjy's "main assignment was to drive [the] [d]efendants at all times wherever he went." Doc. 64 at 16.

In support of the defendants' motion, Ms. Zinsou-Fatimabay and Andry Zinsou submitted declarations, which offer a vivid depiction of Ravelombonjy as an ungrateful and spiteful employee who took advantage of the defendants by living rent-free in their residence with unlimited access to their food, had extremely poor hygiene, failed at fulfilling his job duties, and concocted these false allegations for personal gain. *See* Docs. 65, 66. In Ms. Zinsou-Fatimabay's declaration and its exhibits, which are emails between herself and Ravelombonjy's father, while she describes how Ravelombonjy was expected to work for her husband at the Mission and how the Mission paid for Ravelombonjy's salary, Doc. 65 ¶¶ 18, 23, 45; *id.* at 34, 54, there are instances where she characterizes him as a personal employee who worked for both defendants, as opposed to the Mission. *See, e.g.*, *id.* ¶¶ 21, 23, 26. Furthermore, she describes occasions when Ravelombonjy drove her to run errands and grocery shop. *Id.* ¶ 36; *id.* at 25.

Similarly, in a purported draft of Amb. Zinsou's answer to the Amended Complaint, which is attached as an exhibit to Andry Zinsou's declaration, Amb. Zinsou states: "The responsibility of the Driver of the Chief of Mission was to drive him on *all occasions* so as soon as I recruited one he was attached to my person to ensure that I get *anywhere* I need to be on time. . . . *As Chief of Mission, all what I do is Mission related.* .

. . When I go to a supermarket to buy provisions for the residence I do it as Chief of Mission and my Wife participate[s] in full. . . . So [Ravelombonjy's] assertion of using the services for non-Mission related needs is groundless." Doc. 66 at 36–38 (emphases added); *see also id.* at 38 (explaining that Ravelombonjy was requested to drive the defendants' guests and children), 47 ("It is quite normal that [Ms. Zinsou-Fatimabay] be driven by the driver of the chief of Mission whenever it is possible otherwise the Mission has to provide for her transportation needs. *For a Chief of Mission . . . there is no distinction between mission related and not mission related purpose. All purposes as long as he is in the position are mission related.*") (emphasis added). Courts in this district have rejected arguments of this nature, finding that not all services provided by a diplomat's employee are mission-related by virtue of the diplomat's position. *Rana v. Islam*, 305 F.R.D. 53, 61–62 (S.D.N.Y. 2015); *see also Baoanan*, 627 F. Supp. 2d at 165–66; *Swarna*, 622 F.3d at 137–38.

For the reasons described above, the Court finds that Amb. Zinsou's employment of Ravelombonjy was not an official act, and therefore, Amb. Zinsou cannot avail himself of residual immunity pursuant to Article 39(2) of the VCDR. Therefore, Amb. Zinsou is not immune for the alleged acts underlying Ravelombonjy's employment claims.

### ii.      *Forced Labor and Trafficking Claims*

As Ravelombonjy contends, his claims of forced labor and trafficking concern acts that are not subject to residual immunity pursuant to Article 39(2). *See Baoanan*, 627 F. Supp. 2d at 170 (holding that same claims involved alleged acts that were "entirely peripheral to [the defendant's] official duties as a diplomatic agent" (citation omitted)); *Swarna*, 622 F.3d at 139–40 (finding that the defendant could not claim residual immunity for crimes committed against the plaintiff even assuming *arguendo* that the plaintiff's employment constituted an official act). Because there is no basis for finding that the alleged acts underlying Ravelombonjy's forced labor and human trafficking claims, if true, were performed in the exercise of Amb. Zinsou's diplomatic functions, or

21

that they were performed on behalf of the Mission, such acts are private and therefore not within the scope of residual immunity.  *Baoanan*, 627 F. Supp. 2d at 170.

**B.      Failure to State a Claim**

       *i.*      ***Forced Labor and Trafficking Claims***[12]

The defendants argue that Ravelombonjy's human trafficking allegations are "an incredulous tale" and not comparable to other human trafficking cases.  Doc. 64 at 20–21. First, listing cases involving forced labor claims, the defendants contend that unlike the plaintiffs in those cases, Ravelombonjy was not subjected to substandard living conditions, isolation from others, indefinite withholding of his passport, physical harm, sexual assault, fear of death or kidnapping, forced labor with little or no pay, and control of his movements.  Second, they further contend that Ravelombonjy was not only paid his full salary and the subservice premium, but he also allegedly received free lodging and meals as well as at least 186 days off when Amb. Zinsou was out of the country. Third, although Ravelombonjy's passport was taken away for a period of three months, the Mission, not Amb. Zinsou, required his passport in connection with his employment and returned it thereafter.  Finally, the defendants, relying on the declarations of Andry Zinsou and Ms. Zinsou-Fatimabay, assert that, despite having fired Ravelombonjy for his alleged poor performance, they assisted him in the application request for a G-1 visa so that he could stay in the United States longer.[13]

Although Ravelombonjy was paid his salary, he alleges that he was required to work and be available from 7:00 a.m. to 2:00 a.m. daily, ¶¶ 4, 38; lived in the defendants'

---

[12] Although the defendants' papers contain general statements that the Amended Complaint fails to state a claim upon which relief can be granted, Doc. 64 at 20, they only address the forced labor and trafficking claims.  *See id.* at 20–25; *id.* at 25 ("From the above facts, [Ravelombonjy] cannot make an action for trafficking with respect to the first and second causes of action of the Complaint based on alleged violation of 18 U.S.C. § 1589, 1595.").  Thus, the Court construes the defendants' Rule 12(b)(6) motion to be a motion to dismiss Ravelombonjy's forced labor and trafficking claims only.

[13] The defendants premise their arguments on contradicting Ravelombonjy's factual allegations.  *See, e.g.*, *id.* at 23–25.

basement as he was required to be on call, *id.* ¶ 33; was permitted limited access to the kitchen and charged a fee to use the refrigerator, *id.* ¶¶ 33, 41; had fewer than 10 days off during the course of his employment, *id.* ¶ 4; was unable to sleep, seek medical care when he fell ill, or prepare meals because of his long hours, *id.* ¶ 38; noticed that the defendants searched his room and opened his mail, *id.* ¶ 47; was not permitted to take sick leave or obtain necessary medical treatment, *id.* ¶ 45; and was abused and denigrated, *id.* ¶¶ 35, 36, 43, 46.  However, he had his passport for the majority of his employment, *id.* ¶ 31; was not prevented from leaving the household unaccompanied, *id.* ¶ 42; and was not restricted from having a cell phone, *id.* ¶ 40.  Notably, on numerous occasions, the defendants threatened Ravelombonjy with punishment, including terminating and sending him back to Madagascar, withholding support for the renewal of his expiring visa, and involving U.S. authorities and Beninese military leadership, when he did something that defendants did not like or asked for time off.  *Id.* ¶¶ 36, 39, 48.

A person violates 18 U.S.C. § 1589 when he or she "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means . . . (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]"  18 U.S.C. § 1589(a).

The Second Circuit has recognized that a defendant's alleged threat to cancel or withdraw immigration sponsorship constitutes abuse of legal process for purposes of § 1589(a)(3).  *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019); *Walia v. Veritas Healthcare Sols., L.L.C.*, No. 13 Civ. 6935 (KPF), 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015).  Ravelombonjy alleges that the defendants threatened to send him back to Madagascar or withhold support for renewing his expiring visa, if he did not work or gave them trouble.  ¶¶ 36, 39, 48.  Therefore, Ravelombonjy has plausibly pled a claim for forced labor under § 1589(a)(3).  *See Adia*, 933 F.3d at 93; *Walia*, 2015 WL

4743542, at *4 (finding that defendants' alleged threat of revocation of plaintiff's visa was sufficient to state a claim under § 1589).  Similarly, he has plausibly stated a claim for relief under § 1589(a)(4), as "[t]he defendants' threat that they would withdraw sponsorship could plausibly be understood as a scheme to convince him that he would be harmed by deportation if he left or asked for overtime pay."  *Adia*, 933 F.3d at 93–94 ("The defendants threatened the plaintiff with serious harm—removal from the country due to a loss of legal status . . . while engaging in a scheme whose purpose was to make [the plaintiff] rely on them in remaining in this country legally, to force him to accept less than the prevailing wage rate based on the threat of facing deportation, and similarly to forestall any effort to seek other employment.").  Accordingly, Ravelombonjy has sufficiently pled forced labor claims.

A person violates 18 U.S.C. § 1590 when he or she "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of" the statutes prohibiting, *inter alia*, forced labor.  18 U.S.C. § 1590(a).  Ravelombonjy alleges that the defendants recruited him to come work for Amb. Zinsou, then forced him to work inhumane hours by threatening to expose him to deportation.  ¶¶ 21–22.  "Therefore, if a defendant violates section 1589, he also violates section 1590 if he recruited the person to perform forced labor."  *Adia*, 933 F.3d at 94.  Accordingly, Ravelombonjy has plausibly alleged trafficking claims.

### ii.  *Employment-Related Claims against Ms. Zinsou-Fatimabay*

The defendants argue that any employment-related claims against Ms. Zinsou-Fatimabay should be stricken, because she was not Ravelombonjy's employer, as evidenced by the employment contract.  Ravelombonjy asserts that, pursuant to the FLSA and the NYLL, she was his joint employer, as she acted in the interest of Amb. Zinsou and had the power to hire and fire him, set his schedule, and exercise supervision and control over him.  ¶¶ 56–60, 89, 98.  He further contends that not only did she arrange for his employment, but she requested rides from him, threatened to fire him, and made him

reimburse her for cab fare when he could not drive her.   ¶¶ 38–39.   Although the

defendants concede that she assisted Ravelombonjy with obtaining employment and

asked him to drive her "from time to time," they assert that this is not sufficient to make

her his employer.[14]

      "For liability to attach under the FLSA or the NYLL, a defendant must be an

'employer.'"   *Ruixuan Cui v. E. Palace One, Inc.*, No. 17 Civ. 6713 (PGG), 2019 WL

4573226, at *6 (S.D.N.Y. Sept. 20, 2019) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172

F.3d 132, 139 (2d Cir. 1999)).   Although the FLSA does not define the term "employer"

in the first instance, it provides that an employer "includes any person acting directly or

indirectly in the interest of an employer in relation to an employee."   29 U.S.C. § 203(d);

*see Guerra v. Trece Corp.*, No. 18 Civ. 625 (ER), 2020 WL 7028955, at *8 (S.D.N.Y.

Nov. 30, 2020).

      The NYLL uses a nearly identical definition of the term "employer," and

"[d]istrict courts in this Circuit have interpreted the definition of employer under the

[NYLL] coextensively with the definition used by the FLSA."   *Jianjun Chen v. 2425

Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2017 WL 2600051, at *3

(S.D.N.Y. June 15, 2017) (quoting *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y.

2013)).   Thus, courts in this district have applied the same tests to determine whether an

individual constitutes an employer under the FLSA and the NYLL.   *Olvera v. Bareburger

Grp. LLC*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014).

      In *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984), the Second

Circuit adopted an "economic reality" test to assess whether a defendant is an employer

under the FLSA.   This test considers whether the defendant "(1) had the power to hire and

---

[14] Furthermore, the defendants argue, for the first time in their reply, that (1) there is no personal
jurisdiction over Ms. Zinsou-Fatimabay and (2) Ravelombonjy may not sue Ms. Zinsou-Fatimabay in the
United States, because she is a foreign executor.   Doc. 75 at 18.   It is well-settled that "[a]rguments may not
be made for the first time in a reply brief."   *Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2021 WL 1895033,
at *10 n.6 (S.D.N.Y. May 11, 2021) (quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)).

fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* These factors are to be considered in the totality of circumstances. *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 142–43 (2d Cir. 2008). Further, none of these factors is dispositive, nor are they exclusive. *Id.* Although the *Carter* factors may be sufficient to establish employment status, they are not necessary to do so. *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71 (2d Cir. 2003).

In *Zheng*, the Second Circuit considered a somewhat overlapping set of factors designed to illuminate whether "an entity has *functional* control over workers even in the absence of the *formal* control measured by the *Carter* factors." *Id.* at 72 (emphasis added).[15] Five years later in *Barfield*, 537 F.3d at 143, the Second Circuit held that there is "no rigid rule for the identification of an FLSA employer," as it considered the variety of formal and functional factors set forth in *Carter* and in *Zheng*, respectively, in an effort to "give proper effect to the broad language of the FLSA." "The Second Circuit 'has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances.'" *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) (citation omitted).

Here, although Ms. Zinsou-Fatimabay was not listed as an employer in the employment contract, Ravelombonjy alleged that she arranged for his employment as well as his travel to the United States from Madagascar. ¶¶ 21–22, 30. Furthermore, Ravelombonjy was required to drive both defendants to any location and at any time they requested. *Id.* ¶¶ 34, 38. He was also required to follow Ms. Zinsou-Fatimabay's instructions. *Id.* ¶ 48. On occasions when he was unable to drive Ms. Zinsou-Fatimabay,

---

[15] Among the relevant factors considered in *Zheng* are whether the defendants' premises and equipment were used for the plaintiffs' work, the degree to which the defendants supervised the plaintiffs' work, and whether the plaintiffs worked exclusively or predominantly for the defendants. *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

she requested that he reimburse her for taxi rides.  *Id.* ¶¶ 38, 42.  He further alleged that both defendants threatened to punish him, fire him, or send him back to Madagascar when he either did something that they disliked or asked for time off.  *Id.* ¶¶ 36, 39.  Therefore, although she did not determine the rate and method of payment or maintain his employment records, she had the power to hire and fire him and supervised his work schedule and conditions of employment.  Accordingly, because these allegations are sufficient to create a plausible inference that Ms. Zinsou-Fatimabay was Ravelombonjy's employer, the Court denies the defendants' motion to dismiss the employment claims against her.

### C.      Failure to Join an Indispensable Party

The defendants seek dismissal of the Amended Complaint for failure to join the Mission.  They contend that the Mission is a necessary party for two reasons:  (1) it is a party to the employment contract, and (2) it is responsible for all financial obligations thereunder.[16]  Ravelombonjy disputes that the Mission is a party to the contract.  He further argues that because the Court can "accord complete relief among existing parties" without joining the Mission, the Mission is therefore not necessary.[17]

In general, a breach of contract action may only be maintained against a party to the contract.  *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019)

---

[16] The defendants argue that the Court should be careful not to set a negative precedent for similar cases in the future, but do not provide any detail.  Doc. 64 at 28.  Furthermore, the two cases cited are inapposite. *See Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1310 (5th Cir. 1986) (finding that negative result in the federal suit may harm the absent parties' efforts in the state suit); *Spiro v. Parker Bros.*, No. 91 Civ. 7759 (JFK), 1992 WL 197405, at *2 (S.D.N.Y. Aug. 4, 1992) (recognizing that absent minority owners could be adversely affected by negative precedent if defendant won against majority owners).  In their reply, the defendants assert that the Mission has important interests, because the reputation of the Mission and its members would be implicated by trafficking and forced labor claims.  However, the defendants do not cite a single case in support of this argument.

[17] The two cases cited in support of Ravelombonjy's argument are distinguishable.  *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 386 (2d Cir. 2006) (finding that the absent party was not necessary where the action could potentially impact its rights under a *separate* contract not at issue); *McDougal v. State Univ. of New York Downstate Med. Ctr., Long Island Coll. Hosp.*, No. 12 Civ. 2018 (ILG) (MDG), 2013 WL 1437616, at *5 (E.D.N.Y. Apr. 9, 2013) (examining whether the defendant and the absent party were joint employers in the Title VII context).

(citation omitted).  A non-signatory to a contract may be bound to the terms of an agreement if the "non-signatory is found to have manifested an intent to be bound by the contract."  *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (citing *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632 (N.Y. App. Div. 1997)).  A court will infer an intent to be bound where the non-signatory "is in privity with the plaintiff or has assumed the obligations of the contract."  *Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. Alliance, Inc.*, No. 05 Civ. 7776 (KMK), 2007 WL 1701813, at *5 (S.D.N.Y. June 12, 2007) (citation and internal quotation marks omitted). Such an inference is based on "the totality of [a party's] expressed words and deeds." *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397.  "For example, courts have found that a non-signatory assumed the obligations of an agreement where the non-signatory:  (1) participated in the negotiation of the contract; (2) micromanaged performance under the contract; (3) acknowledged it was the real party in interest; and (4) made payments on behalf of the signatory."  *Roldan v. Second Dev. Servs., Inc.*, No. 16 Civ. 2364 (DLI) (PK), 2018 WL 1701938, at *8 (E.D.N.Y. Mar. 30, 2018) (collecting cases).

Here, as further set forth above, the employment contract was signed between Ravelombonjy and Amb. Zinsou.  The defendants do not dispute that Amb. Zinsou is identified as the employer, nor do they dispute that he signed the contract.  Doc. 64 at 14. The parties dispute, however, whether Amb. Zinsou signed in his capacity as a representative for, and on behalf of, the Mission.  While the defendants point to the fact that the agreement was signed by two other Mission representatives, was affixed with the Mission's seal and written on the Mission's letterhead, and specified financial obligations for the Mission, including the payment of salary and health insurance, Ravelombonjy contends that the contract imposed duties on, and listed, Amb. Zinsou as the employer, not the Mission.  *See* Doc. 9-1.  Nevertheless, even assuming *arguendo* that either Amb. Zinsou or the Mission was not a signatory, each arguably manifested an intent to be bound by and benefit from the agreement.  While Amb. Zinsou supervised and managed

Ravelombonjy's performance under the contract, the Mission issued Ravelombonjy's checks and was otherwise responsible for paid sick leave and health insurance.

At this stage, the Court cannot conclusively determine whether Amb. Zinsou or the Mission was Ravelombonjy's employer and party to the employment contract.[18]  If the Court were to find Amb. Zinsou is *not* liable to Ravelombonjy, then the Mission's "'obligations under that contract would remain undetermined at the conclusion of this litigation'—a scenario which Rule 19 seeks to avoid." *Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, No. 09 Civ. 1431 (SAS), 2009 WL 2135396, at *3 (S.D.N.Y. July 16, 2009) (quoting *Hovensa, L.L.C. v. Technip Italy S.P.A.*, No. 08 Civ. 1221, 2009 WL 690993, at *3 (S.D.N.Y. Mar. 16, 2009)).  In contrast, if the Court were to hold that Amb. Zinsou *is* liable to Ravelombonjy, then Amb. Zinsou "would have an interest in claiming over against [the Mission]." *Id.* (quoting *Hovensa, L.L.C.*, 2009 WL 690993, at *3).  Therefore, the Mission is a necessary party to Ravelombonjy's claims arising out of the contract.

The parties agree that the Mission cannot be joined because of its sovereign immunity.[19]  Thus, the Court must determine whether the necessary party is indispensable.  Rule 19(b) specifies four factors for this determination:  (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit.  Fed. R. Civ. P. 19(b).  Contrary to the defendants' assertions, the Second Circuit has held that "a bright-line rule that all parties

---

[18] At the outset, the Court notes that the parties did not provide supporting case law for their arguments regarding whether Amb. Zinsou and the Mission are or are not parties to the employment contract.

[19] The defendants appear to suggest that the Court may waive the Mission's immunity.  Doc. 64 at 27. However, the only case cited in support of this argument, *Fontaine v. Permanent Mission of Chile to United Nations*, No. 17 Civ. 10086 (AT), 2020 WL 5424156 (S.D.N.Y. Aug. 18, 2020), is inapposite, as the court found that the Chilean Mission had waived its sovereign immunity through the choice of law provision in the contract.  No such allegations exist here.

to a contract are indispensable . . . is inconsistent with Rule 19(b)'s flexible standard." *CP Sols. PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009).

As to the first two factors, the defendants argue that Amb. Zinsou will be prejudiced, because a judgment for Ravelombonjy might hold the defendants personally accountable for the Mission's financial obligations. They also argue that such judgment without the Mission may impair the Mission's ability to defend itself in a later action.[20] The Second Circuit has rejected contentions of this nature. *See id.* "Given the absence from the complaint of any action attributable only to [the Mission], the chance that [the Mission's] actions were the sole or primary cause of [Ravelombonjy's] damages appears remote." *Id.* In fact, Ravelombonjy has alleged that Amb. Zinsou, not the Mission, breached the contract. Thus, only Amb. Zinsou is subject to liability by virtue of his own duties and actions. *Id.* at 159–60. Moreover, the defendants could seek to bring a claim against the Mission. *Id.* at 160.

As to the third factor, the defendants argue that the public interest in avoiding piecemeal and inefficient litigation is strong here,[21] where Ravelombonjy could bring

---

[20] Although the parties do not raise the issue, or otherwise cite apposite case law regarding the interplay of joinder and foreign sovereign immunity, the Court recognizes that in *Republic of Philippines v. Pimentel*, the Supreme Court found that the district court and the Ninth Circuit failed to give sufficient weight to the likely prejudice to the absent Republic of the Philippines and Philippine commission, which were necessary but immune to suit, when holding that the action could proceed without them. 553 U.S. 851, 865 (2008). The Supreme Court held that: "A case may not proceed when a required-entity sovereign is not amenable to suit. . . . [W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 867. However, this case is distinguishable. Unlike the Mission here, the absent foreign entities in *Pimentel* asserted claims arising from events of historical and political significance for the Republic and its people; had a unique interest in resolving the ownership of or claims to the assets at issue; and faced the possibility that the property they claimed would be seized by the decree of a foreign court. *Id.* at 866. The defendants have not argued that any of these issues are present here.

[21] The case cited by Ravelombonjy, *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 223 F.R.D. 103, 107 (W.D.N.Y. 2004), in support of his argument that the defendants' contention regarding multiple litigation is too speculative, is inapposite. There, the court determined that it would be speculative to find that potential future litigation against the absent party relating to its provision of services to multiple municipalities, each of which had different policies, would involve the exact same causes of action and facts.

another action against the Mission.[22]  However, as Ravelombonjy asserts, this argument fails to take into consideration the fact that the Mission would likely argue that it is immune from suit, thus foreclosing him from bringing any claims against it.

As to the fourth factor, the defendants argue, for the first time in their reply, that Ravelombonjy has an alternative route to pursue this case in Benin where the defendants and their assets are located.[23]  They also speculate, without any support, that "it may be more challenging for Amb. Zinsou to claim immunity if he is attacked in his home country."  Doc. 75 at 13.  Ravelombonjy argues that he would face undue prejudice if he were forced to add the Mission as a party, because certain of his claims would be time barred.  The defendants do not address this argument.

Because the defendants have failed to meet their burden of showing that the Mission is indispensable, the Court denies their motion to dismiss this action for failure to join an indispensable party.  *Greenwich Life Settlements, Inc.*, 742 F. Supp. 2d at 455.

## IV.    CONCLUSION

For the reasons discussed above, the Court denies the defendants' motion to dismiss, Doc. 63.  Accordingly, the defendants' request for oral argument is denied as moot.  The defendants are directed to answer the Amended Complaint by October 20, 2022.  The parties are directed to appear at a telephonic initial pre-trial conference on October 26, 2022 at 11 a.m.  The parties should dial 877-411-9748 and enter access code 3029857# when prompted.  The parties should also jointly file on ECF a proposed case management plan and scheduling order, found on the Court's website, prior to the conference.

---

[22] In support of this assertion, the defendants cite a distinguishable case involving the same issues of fact and law and identical claims against companies that each issued insurance policies to the plaintiff. *Evergreen Park Nursing & Convalescent Home, Inc. v. Am. Equitable Assur. Co.*, 417 F.2d 1113, 1115 (7th Cir. 1969).

[23] In their motion, the defendants mistakenly analyze whether the Mission, as opposed to Ravelombonjy, will have an adequate forum if the action is dismissed.  Doc. 64 at 30.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 56 and 63.

It is SO ORDERED.

Dated:    September 29, 2022
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.